## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                    )

**AMERICAN BAR ASSOCIATION**   )
                    )

      **Plaintiff,**        )
                    )

      **v.**            )   **No. 1:09-cv-01636-RBW**
                    )

                    )

**FEDERAL TRADE COMMISSION**   )
                    )

      **Defendant.**      )
                    )
_____ )

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

WILLARD K. TOM
General Counsel

JOHN F. DALY
Deputy General Counsel for Litigation

MICHAEL D. BERGMAN
Attorney
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, D.C.  20580
(202) 326-3184
Fax: (202) 326-2477
mbergman@ftc.gov

*Attorneys for Defendant*
*Federal Trade Commission*

October 13, 2009

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      1.    FACT Act, ECOA, and Regulation B . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      2.    The Joint Identity Theft "Red Flags" Rules . . . . . . . . . . . . . . . . . . . . . . . 7

      3.    Extensions of the Commission's rule enforcement and
           statements regarding the coverage of attorneys . . . . . . . . . . . . . . . . . . . 10

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    THE FACT ACT'S DEFINITION OF "CREDITOR" APPLIES TO
    ATTORNEYS WHO BILL THEIR CLIENTS AFTER PROVIDING LEGAL SERVICES
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      A.    The Commission was simply following the plain language in
           the FACT Act to subject attorneys who defer payment to the
           Red Flags Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      B.    The official FRB staff interpretation that lawyers that defer
           payment of a bill are creditors under the ECOA (and therefore
           the FACT Act) is "authoritative" and dispositive of this case . . . . . . . . . 21

      C.    Neither the *ABA-GLBA* case nor the Clear Statement Rule compels
           granting the ABA's motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

           1.    The Commission's application of the Red Flags Rule to
                lawyers who regularly defer payments flows naturally
                from the statutory language, Supreme Court precedent,
                and consistent administrative interpretation . . . . . . . . . . . . . . . 27

2.      The Red Flags Rule does not intrude into a core state function regulating a lawyer's relationship with her client . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

D.      Subjecting attorneys to the Red Flags Rule does not "preempt" state law, but rather makes attorneys who permit deferred payments subject to both set of rules . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

E.      Granting plaintiff's motion in this facial challenge would exempt all attorneys from the Red Flags Rule in all circumstances regardless of their billing arrangements or the circumstances of the identity theft . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

F.      The compliance burden on attorneys is minimal and will protect the attorney . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*ABA v. FTC*,
   430 F.3d 457 (D.C. Cir. 2005), *aff'g*,
   *N.Y. State Bar Ass'n v. FTC*, Civil Action No. 02-810 (RBW),
   2009 WL 964173 (D.D.C. Apr. 30,, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 106 S. Ct. 2505 (1986)         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Arrington v. U.S.*,
   473 F.3d 329 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Auer v. Robbins*,
   519 U.S. 452, 117 S. Ct. 905 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Barney v. Holzer*,
   902 F. Supp. 139 (S.D. Ohio 1995), *aff'd as modified*,
   110 F.3d 1207 (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 25

*In re Brazil*,
   21 B.R. 333 (Bank. N.D. Ohio 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Brothers v. First Leasing*,
   724 F.2d 789 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 23

*Crosby v. National Foreign Trade Council*,
   530 U.S. 363, 120 S. Ct. 2288 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Crowe v. Henry*,
   43 F.3d 198 (5th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Dresser Industries, Inc. v. United States*,
   238 F.3d 603 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Duncan v. Handmaker*,
   149 F.3d 424 (6th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*English v. General Electric Co.*,
   496 U.S. 72, 110 S. Ct. 2270 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

iii

*FTC v. Superior Court Trial Lawyers Associate,*
  493 U.S. 411, 110 S. Ct. 768 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Florida Lime & Avocado Growers, Inc. v. Paul,*
  373 U.S. 132, 83 S. Ct. 1210 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Foley, Hoag & Eliot,*
  229 N.L.R.B. 456 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

* *Ford Motor Credit Co., v. Milhollin,*
  444 U.S. 555, 100 S. Ct. 790 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Fraternal Order of Police v. U.S.,*
  173 F.3d 898 (D.C. Cir 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Geier v. American Honda Motor Co., Inc.,*
  529 U.S. 861, 120 S. Ct. 1913 (2000)     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

* *Goldfarb v. Virginia State Bar,*
  421 U.S. 773 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 29, 30

*Gregory v. Ashcroft,*
  501 U.S. 452 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Group Life & Health Insurance Co. v. Royal Drug Co.,*
  440 U.S. 205, 99 S. Ct. 1067 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

* *Heintz v. Jenkins,*
  514 U.S. 291, 115 S. Ct. 1489 (1995)     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Helm v. State of California,*
  722 F.2d 507 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hishon v. King & Spalding,*
  467 U.S. 69, 104 S. Ct. 2229 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Jefferson County Pharm. Ass'n v. Abbott Labs.,*
  460 U.S. 150 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Jenkins v. Landmark Mortgage Corp. of Virginia,*
  696 F. Supp. 1089 (W.D. Va. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Kline v. First Western Government Securities, Inc.,*
  24 F.3d 480 (3d Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Laramore v. Ritchie Realty Management Co.*,
    397 F.3d 544 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 25

*Lewis v. ACB Business Services, Inc.*,
    135 F.3d 389 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Liberty Leasing Co. v. Machamer*,
    6 F. Supp. 2d 714 (S.D. Ohio 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Mays v. Buckeye Rural Electric Cooperative*,
    277 F.3d 873 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Medtronic, Inc. v Lohr*,
    518 U.S. 470, 116 S. Ct. 2240 (1996)     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Curran*,
    456 U.S. 353 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Mick's at Pennsylvania Avenue, Inc. v. BOD, Inc.*,
    389 F.3d 1284 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Mick v. Level Propane Gases, Inc.*,
    183 F. Supp. 2d 1014 (S.D. Ohio 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*N.Y. State Bar Association v. FTC*,
    276 F. Supp. 2d 110 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 31

*Nevarez v. O'Connor Chevrolet, Inc.*,
    303 F. Supp. 2d 927 (N.D. Ill. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*New York v. U.S.*,
    505 U.S. 144, 112 S. Ct. 2408 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Northwest Central Pipeline Corp. v. State Corp. Commission of Kansas*,
    489 U.S. 493, 109 S. Ct. 1262 (1989)     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Pacific Gas & Electric Co. v. State Energy Resources Conserv. & Development Commission*,
    461 U.S. 190, 103 S. Ct. 1713 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Puerto Rico Maritime Shipping Authority v. ICC*,
    645 F.2d 102 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Reno v. Flores*,
    507 U.S. 292, 113 S. Ct. 1439 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Riethman v. Berry*,
    287 F.3d 274 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332, 109 S. Ct. 1835 (1989)     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Shaumyan v. Sidetex, Co.*,
    900 F.2d 16 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Troy Corp. v. Browner*,
    1230 F.3d 277 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Salerno*,
    481 U.S. 739, 107 S. Ct. 2095 (1987)     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Shimer*,
    367 U.S. 374 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Williams v. AT&T Wireless Services*,
    5 F. Supp. 2d 1142 (W.D. Wash. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 25

*Wyatt v. Cole*,
    504 U.S. 158, 112 S. Ct. 1827 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Wyeth v. Levine*,
    129 S. Ct. 1187 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    *   Denotes case authorities on which the Commission chiefly relies.


## STATUTES

Administrative Procedure Act
5 U.S.C. § 706(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Consumer Credit Protection Act

    15 U.S.C. § 1601 *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Equal Credit Opportunity Act

    15 U.S.C. § 1691 *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 21, 36

15 U.S.C. §1691 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

15 U.S.C. § 1691a(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 16, 27, 29, 31

15 U.S.C. § 1691b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

15 U.S.C. § 1691b(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 24

15 U.S.C. § 1691c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

15 U.S.C. § 1691c-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

15 U.S.C. § 1691e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

15 U.S.C. § 1691e(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Pub. L. No. 93-495, 88 Stat. 1522 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Pub. L. No. 94-239, 90 Stat. 251 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Pub. L. No. 101-73, 103 Stat. 439 (Aug. 9, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Pub. L. No. 102-550, 106 Stat. 4082 (Oct. 28, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Pub. L. No. 104-88, 109 Stat. 948 (Dec. 29, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Pub. L. No.104-208, 110 Stat. 3009-420 (Sept. 30, 1996) . . . . . . . . . . . . . . . . . . . . . . . 24

Fair and Accurate Credit Transactions Act of 2003 (the "FACT Act"), Pub. L.
No. 108-159, 117 Stat. 1952 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fair Credit Reporting Act

15 U.S.C. § 1681 *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

15 U.S.C. § 1681a(q)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 15

15 U.S.C. § 1681m . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 12, 18

Fair Debt Collections Practices Act

15 U.S.C. § 1692a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

Gramm-Leach-Bliley Act

    15 U.S.C. § 6801 *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Sherman Antitrust Act

    15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Truth in Lending Act

    15 U.S.C. § 1640(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## LEGISLATIVE MATERIALS

94 Cong. Rec. 16740-41 (daily ed. June 3, 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

H.R. Rep. 108-396 (2003) (Conf. Rep.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18

H.R. 3763, 111th Cong. (1st Sess. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

H.R. Rep. No. 94-210 (May 14, 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

S. 1753, 108th Cong. (1st Sess. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## RULES, REGULATIONS, AND REGULATORY MATERIALS

12 C.F.R. §§ 202.1 - 202.17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

12 C.F.R. § 202.2(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

12 C.F.R. § 202.2(l) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

12 C.F.R. § 202.3(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

12 C.F.R. 202.3-3(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

12 C.F.R. 202.10(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

12 C.F.R. § 225.28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

16 C.F.R.§ 603.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

16 C.F.R. § 681.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 18

16 C.F.R. § 681.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Equal Credit Opportunity ("Regulation B"), 40 Fed. Reg. 49,298 (Oct. 22, 1975) . . . . . . . . . . . 6

Equal Credit Opportunity; Revision of Regulation B, Official Staff Commentary
Official Staff Commentary, 12 C.F.R. pt. 202,  Supp. I, 50 Fed. Reg. 48,018, 48,049
(Nov. 20, 1985), 1985 WL 126616 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 22

Equal Credit Opportunity, Official Staff Commentary,
12 C.F.R. pt 202, Supp. I, § 202.1 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Equal Credit Opportunity, Official Staff Commentary,
12 C.F.R. pt 202, Supp. I, § 202.2 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Equal Credit Opportunity, Official Staff Commentary,
12 C.F.R. pt 202, Supp. I, § 202.3 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 22, 27

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 38

Final Rule, Identity Theft Red Flags and Address Discrepancies Under the Fair and
Accurate Credit Transactions Act of 2003, 72 Fed. Reg. 63,718
(Nov. 9, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9, 10, 36

FTC Enforcement Policy: Identity Theft Red Flags Rule, 16 CFR 681.2 (Oct. 22, 2008) . . . . . . 10

FTC Extended Enforcement Policy: Identity Theft Red Flags Rule, 16 CFR 681.1
        (April 30, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

FTC Extended Enforcement Policy: Identity Theft Red Flags Rule, 16 CFR 681.1
        (July 29, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

FTC The Red Flags Rule: Frequently Asked Questions . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 21

Proposed Rule, Identity Theft Red Flags and Address Discrepancies Under the Fair and
Accurate Credit Transactions Act of 2003, 71 Fed. Reg. 40,786 . . . . . . . . . . . . . . . . . . . . . . 7

Technical Corrections, Identity Theft Red Flags and Address Discrepancies
Under the Fair and Accurate Credit Transactions Act of 2003, 74 Fed.
Reg. 22,639, 22,645 (May 14, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## OTHER AUTHORITIES

The American Heritage Dictionary (2d College ed. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

The Connecticut Law Tribune (Sept. 18, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
**AMERICAN BAR ASSOCIATION**              )
                                          )
      **Plaintiff,**                )
                                          )
      **v.**                        )    **No. 1:09-cv-01636-RBW**
                                          )
                                          )
**FEDERAL TRADE COMMISSION**              )
                                          )
      **Defendant.**                )
                                          )
_____ )

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## INTRODUCTION

Identity theft has become a significant concern to millions of Americans requiring substantial time and expense to clear their good name.  In 2003, Congress passed legislation designed to protect consumers against the scourge of identity theft, in part, by requiring "creditors" – defined broadly –  to design and implement written programs to identify the "red flags" of identity theft in order to prevent and mitigate injury to innocent victims.  The 2003 legislation incorporated the terms "credit" and "creditor" that have been defined consistently and publicly by the agency in charge of their interpretation for nearly 25 years as encompassing all service providers who "defer the payment" for services – including lawyers.

In this case, plaintiff American Bar Association ("ABA") makes a facial challenge to an enforcement policy of the Federal Trade Commission ("Commission" or "FTC") stating that lawyers – like other service providers – may be covered by the Commission's Red Flags Rule, if their billing practices result in their being creditors.  However, attorneys who defer billing for

their legal services fall within the plain meaning of the statute, and the ABA cannot show why attorneys should be treated differently from any other creditor or why the Red Flags Rule should *never* apply to attorneys, regardless of their billing arrangements or the frequency or severity of identity theft that may arise in the course of providing and billing for legal services. Significantly, the Red Flags Rule protects non-clients, such as the victims of identity theft in whose name the services are sought, that do not have similar protections under state bar rules. Finally, the case the ABA places nearly complete reliance upon, *ABA v. FTC*, 430 F.3d 457 (D.C. Cir. 2005), *aff'g*, *N.Y. State Bar Ass'n v. FTC*, Civil Action No. 02-810 (RBW), 2004 WL 964173 (D.D.C. Apr. 30, 2004) (collectively, "*ABA-GLBA*"), does not control here. The Commission respectfully requests that this Court deny plaintiff's motion for partial summary judgment.

## STATEMENT OF FACTS[1]

### STATUTORY AND REGULATORY BACKGROUND

1. FACT Act, ECOA, and Regulation B

In part to respond to the serious increase in identity theft, Congress enacted the Fair and Accurate Credit Transactions Act of 2003 (the "FACT Act"), Pub. L. No. 108-159, 117 Stat.

---

[1] The September 2, 2008, Order of this Court amended Local Civil Rule 7 and 56.1, by deleting Local Civil Rule 56.1 and making Local Civil Rule 7(h)(1) inapplicable to cases in which judicial review is based solely on the administrative record. Instead, "[i]n such cases, motions for summary judgment and oppositions thereto shall include a statement of facts with references to the administrative record." Plaintiff filed their motion before an answer was required by the Commission and no schedule has been set imposing a deadline for the filing of the administrative record in this case. The parties have represented that they intend to file an appendix with those portions of the administrative record that are cited or otherwise relied upon on the motion for partial summary judgment or in opposition to the motion by October 23, 2009. *See* Docket Entry No. 8 at 2, ¶ (d). This Statement of Facts includes citations to certain portions of the administrative record that are publicly available. The Commission does not dispute the citations included in Plaintiff's Statement of Material Facts Not in Dispute, Docket Entry No. 7.

1952, which amended the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* The

FACT Act amendments were designed to "amend the Fair Credit Reporting Act, to prevent

identity theft, improve resolution of consumer disputes, improve the accuracy of consumer

records, make improvements in the use of, and consumer access to, credit information, and for

other purposes."[2]  H.R. Rep. No. 108-396 (2003) (Conf. Rep.), *as reprinted in* 2003 U.S.C.C.A.N.

1753.   Title I of the Act concerned "Identity Theft Prevention and Credit History Restoration."

Most significantly for present purposes, Section 114 of the FACT Act (codified at 15

U.S.C. § 1681m(e)), amended section 615 of the FCRA, 15 U.S.C. § 1681m, to require the

Commission and the federal banking regulators[3] to issue joint regulations and guidelines

regarding the detection, prevention and mitigation of identity theft.  Specifically, Section 114

required the agencies to jointly "establish and maintain guidelines for use by each financial

institution and each creditor regarding identity theft with respect to account holders at, or

customers of, such entities, and update such guidelines as often as necessary."  15 U.S.C.

§ 1681m(e)(1)(A).  The agencies were also jointly directed to "prescribe regulations requiring

each financial institution and each creditor to establish reasonable policies and procedures for

implementing the guidelines established pursuant to subparagraph (A), to identify possible risks

to account holders or customers or to the safety and soundness of the institution or customers."

---

[2]  Section 111 of the FACT Act defined "identity theft" as "a fraud committed using the identifying information of another person, subject to such further definition as the Commission may prescribe, by regulation." 15 U.S.C. § 1681a(q)(3).

[3]  The relevant agencies are the "Federal banking agencies" (*i.e.,* the Federal Deposit Insurance Corporation, the Board of Governors of the Federal Reserve System ("FRB"), the Office of the Comptroller for the Currency, and the Office of Thrift Supervision), the National Credit Union Administration, and the Commission (collectively "agencies").

15 U.S.C. § 1681m(e)(1)(B).[4]  Further, in developing these guidelines, the agencies "shall

identify patterns, practices, and specific forms of activity that indicate the possible existence of

identity theft."  15 U.S.C. § 1681m(e)(2).

The definitions of "creditor" and "credit" in the FACT Act expressly incorporated the

definitions from the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.* (2009).

*See* 15 U.S.C. § 1681a(r)(5).[5]  The ECOA is Title VII of the Consumer Credit Protection Act

("CCPA"), 15 U.S.C. § 1601 *et seq.* (2009), and the FCRA is Title VI of the CCPA.[6]  The ECOA

makes it unlawful for any creditor to discriminate against any applicant with respect to any aspect

of a credit transaction on the basis of race, color, religion, national origin, sex or marital status or

age; because all or part of the applicant's income derives from any public assistance program; or

because the applicant has in good faith exercised any right under the Consumer Credit Protection

Act.  15 U.S.C. § 1691(a).[7]

---

[4]  "Customers" is probably a drafting error and should likely be "creditor."

[5]  The 2003 FACT Act amendments defined the terms "creditor" and "credit" in the
FCRA for the first time.

[6]  The CCPA, 15 U.S.C. § 1601 *et seq.* (2009), is a comprehensive statute designed to
protect consumers by requiring full disclosure of financial terms in most credit transactions,
making unlawful the use of certain unethical practices in the garnishment of wages and debt
collection, regulating the transfer of funds by electronic means, and prohibiting discrimination in
credit transactions.  Other titles included in the CCPA include the Truth in Lending Act (Title I)
and the Fair Debt Collection Practices Act ("FDCPA") (Title VIII).

[7]  The ECOA was originally enacted in 1974, in order to prohibit the denial of credit on
the basis of gender or marital status.  Pub. L. No. 93-495, 88 Stat. 1522 (1974).  In 1976, the Act
was amended to prevent discrimination in the extension of credit on the basis of race, color,
religion, national origin, and age.  Pub. L. No. 94-239, 90 Stat. 251 (1976).  The legislative
history of the 1976 amendments show that Congress intended the statute to apply very broadly
and to encompass all forms of credit, including that extended incidentally in the course of the
creditor's core business.  *See, e.g.*, H.R. Rep. No. 94-210, at 3 (May 14, 1975) (Committee
Report for the Committee on Banking Currency, and Housing on H.R. 6516, the Equal Credit

The ECOA defines "creditor" as "any person who regularly extends, renews or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew or continue credit." 15 U.S.C. § 1691a(e). "Credit," in turn, is defined in the ECOA as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." 15 U.S.C. § 1691a(d).

The FRB is charged with issuing implementing regulations to carry out the purposes of the ECOA, *see* 15 U.S.C. § 1691b(a), and has issued the ECOA implementing regulation, referred to as "Regulation B," under 12 C.F.R. pt. 202. Regulation B defines "credit" as "the right granted by a creditor to an applicant to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment therefor." 12 C.F.R. § 202.2(j) (2009). The rule defines "creditor" as, *inter alia*, "a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit." 12 C.F.R. § 202.2(l) (2009).

The FRB has authorized its staff to issue official staff interpretations or commentaries as a guide to compliance with Regulation B. *See* Official Staff Commentary on Regulation B, 12 C.F.R. pt. 202, Supp. I (prefatory paragraph) (2009). The FRB official staff commentaries

---

Opportunity Act Amendments of 1975) (quoting Dr. Arthur S. Flemming, Chairman of the U.S. Commission on Civil Rights, in testimony before the Consumer Affairs Subcommittee) ("It would be difficult to exaggerate the role of credit in our society. Credit is involved in an almost endless variety of transactions reaching from the medical delivery of the newborn to the rituals associated with the burial of the dead."); 94 Cong. Rec. 16740-41 (daily ed. June 3, 1975) (remarks of Mr. Annunzio on H.R. 6516, the Equal Credit Opportunity Act Amendments of 1975) ("Credit discrimination cannot be dismissed lightly. Credit has a profound effect on the life of virtually every person in this country. Few of us pay cash. We pay for meals, transportation, homes, cars, hospital care, and numerous other every day necessities through extensions of credit.").

discuss the broad scope of the ECOA and Regulation B and the types of credit and creditors subject to the rule. *See, e.g.*, 12 C.F.R. pt. 202, Supp. I, § 202.1, ¶ 1(a) (2009) ("Scope. The Equal Credit Opportunity Act and Regulation B apply to all credit – commercial as well as personal – without regard to the nature or type of credit or the creditor"); *Id.*, § 202.2, ¶ 2(j) ("Under Regulation B, a transaction is credit if there is a right to defer payment of a debt – regardless of whether the credit is for personal or commercial purposes, the number of installments required for repayment, or whether the transaction is subject to a finance charge.").

Most importantly for the present litigation, the FRB Official Staff Commentaries have, ever since 1985, expressly stated that "lawyers" who "defer the payment of a bill" extend "incidental credit" under 12 C.F.R. § 202.3(c), and therefore, while exempt from certain procedural requirements under Regulation B, are subject to the general prohibition against discrimination in the ECOA and Regulation B. *See* Equal Credit Opportunity; Revision of Regulation B, Official Staff Commentary, 12 C.F.R. pts. 202 and 202a, Supp. I, § 202.3, ¶ 3(c)-1, 50 Fed. Reg. 48,018, 48,049 (Nov. 20, 1985), 1985 WL 126616.[8] The current FRB Official Staff Commentary states as examples of "incidental credit":

> If a service provider (such as a hospital, doctor, *lawyer*, or merchant) allows the client or customer to defer the payment of a bill, this deferral of debt is credit for purposes of the regulation, even though there is no finance charge and no agreement for payment in installments. Because of the exceptions provided by this section, however, these particular credit extensions are excepted from compliance with certain procedural requirements as specified in § 202.3(c).

---

[8] Regulation B was first issued in 1975. *See* Equal Credit Opportunity, 40 Fed. Reg. 49,298 (Oct. 22, 1975) (codified at 12 C.F.R. pt. 202). Regulation B listed certain nontraditional creditors, including professionals and neighborhood merchants, who permitted their patients or customers to defer payment of a fees "as a convenience" as extending "incidental credit." *See* 40 Fed. Reg. at 49,304-05 (codified at 12 C.F.R. 202.10(b)). Such "incidental credit," while "covered by the Act's broad definition of 'creditor,'" is exempt from certain procedural requirements in Regulation B. *Id.*

12 C.F.R. pt. 202, Supp. I, § 202.3, ¶ 3(c)-1 (2009) (emphasis added).

The keystone for all types of "credit" under Regulation B is whether there has been a deferral of payment for services. *See, e.g.*, 12 C.F.R. pt. 202, Supp. I, § 202.3, ¶ 3(a)-2 (2009) ("[a] utility company is a creditor [under the "Public-utilities credit"] when it supplies utility service and bills the user after the service has been provided.").

2. <u>The Joint Identity Theft "Red Flags" Rules</u>

On July 18, 2006, the agencies published a joint notice of proposed rulemaking ("NPRM"), 71 Fed. Reg. 40,786, proposing rules and guidelines to implement section 114 and proposing rules to implement section 315 of the FACT Act. The agencies collectively received a total of 129 comments after a 60-day comment period. While certain commenters responding to the NPRM noted the potentially broad scope of the proposed "creditor" definition,[9] no attorneys or bar associations submitted comments regarding whether attorneys should or should not be covered as "creditors" under the Act.

On November 9, 2007, the agencies published a notice of final rulemaking in the Federal Register jointly issuing final rules and guidelines implementing section 114 of the FACT Act and final rules implementing section 315 of the FACT Act. Identity Theft Red Flags and Address Discrepancies Under the Fair and Accurate Credit Transactions Act of 2003, 72 Fed. Reg. 63,718 (Nov. 9, 2007) ("Red Flags Rule" or "Rule"). The Rules required each financial institution and

---

[9] *See, e.g.*, ACA International (Sept. 18, 2006) (available at http://www.ftc.gov/os/comments/ redflags/523455-00037.pdf) (arguing debt collectors should not be considered "creditors"); Nat'l Assoc. of Realtors (Sept. 15, 2006) (available at http://www.ftc.gov/os/comments/redflags/523455-00003.pdf) (arguing realtors should not be considered "creditors"). These commenters raised concerns even though neither the debt collectors nor realtors were specifically mentioned as "creditors" in the proposed rule.

7

creditor to implement a written program to detect, prevent, and mitigate identity theft in connection with the opening of a covered account or any existing covered account.

The FTC issued its Identity Theft Rules, including its Red Flags Rule, in 16 C.F.R. pt. 681.  *See* 72 Fed. Reg. at 63,771-04.[10]  The Rule requires "creditors" and "financial institutions" to conduct a risk assessment to determine if they have "covered accounts," which include consumer-type accounts or other accounts for which there is a reasonable risk of identity theft.  16 C.F.R. § 681.1 (2009).  The term "covered accounts" includes "[a]n account that a financial institution or creditor offers or maintains, primarily for personal family or household purposes, that involves or is designed to permit multiple payments or transactions, such as a credit card account, mortgage loan, automobile loan, margin account, cell phone account, utility account, checking account, or savings account."  16 C.F.R. § 681.1(b)(3)(i) (2009).  The term also includes "[a]ny other account that the financial institution or creditor offers or maintains for which there is a reasonably foreseeable risk to customers or to the safety and soundness of the financial institution or creditor from identity theft, including financial, operational, compliance, reputation or litigation risks."  *Id.*, § 681.1(b)(3)(ii).

Under the FTC's Rule, the term "[c]redit has the same meaning as in 15 U.S.C. 1681a(r)(5) [the ECOA]."  16 C.F.R. § 681.1(b)(4).  Similarly, the term "[c]reditor has the same meaning as in 15 U.S.C. 1681a(r)(5) [the ECOA], and includes lenders such as banks, finance

---

[10]  The FTC's Red Flags Rule was originally codified as 16 C.F.R. § 681.2 (2003), *see* 72 Fed. Reg. at 63,772, but was recodified as 16 C.F.R. § 681.1.  *See* Technical Corrections, Identity Theft Red Flags and Address Discrepancies Under the Fair and Accurate Credit Transactions Act of 2003, 74 Fed. Reg. 22,639, 22,645 (May 14, 2009).  The rule adopted the definition for "identity theft" in 16 C.F.R. § 603.2 to mean "a fraud committed or attempted using the identifying information of another person without authority," 16 C.F.R. § 681.1(b)(8), and defined the term "Red Flag" to mean "a pattern, practice or specific activity that indicates the possible existence of identity theft."  16 C.F.R. § 681.1(b)(9).

companies, automobile dealers, mortgage brokers, utility companies, and telecommunications companies." 16 C.F.R. § 681.1(b)(5). The Commission recognized in the commentary to the Final Rule that a "broad scope of entities" were covered and that the Rule's definition of "creditor" adopted the definition from the ECOA, which "defines credit as a transaction in which the party has a right to defer payment of a debt, regardless of whether the credit is for personal or commercial purposes." 72 Fed. Reg. at 63,741.

Each creditor or financial institution "must periodically determine whether it offers or maintains covered accounts . . ." 16 C.F.R. § 681.1(c). If it does, the covered entity must develop and implement a written identity theft prevention program to identify, detect and respond to possible risks of identity theft applicable to them. 16 C.F.R. § 681.1(d). The program would need to specify measures implemented to prevent identity theft, for example by checking a government-issued picture ID card for new accounts or customers. The program would also need to indicate how the entity will respond if a red flag has been detected so as to mitigate the risks of ID theft, such as not billing the client or consumer whose identity was compromised, ensuring that information relating to the identity thief is not commingled with that of the victim, or reporting incidents of identity theft to law enforcement agencies. The covered entity needs to update its program periodically to guard against current ID theft risks, and provide for the continued administration of the program. 16 C.F.R. § 681.1(e).

The Rule was drafted to be risk-based, *i.e.*, the nature and complexity of a covered entity's written program would be proportional to the risk of identity theft it encounters. Thus, low-risk entities would only have a minimal compliance burden and, typically, a streamlined program would suffice. *See* 72 Fed. Reg. at 63,742.

The final Rule became effective on January 1, 2008 and initially required full compliance for all covered entities by November 1, 2008.  72 Fed. Reg. at 63,718.

3.  Extensions of the Commission's rule enforcement and statements regarding the coverage of attorneys

Owing to uncertainty among creditors or financial institutions as to coverage or their obligations under the Rule, on October 22, 2008, the Commission issued an Enforcement Policy statement delaying enforcement of the rule as to entities under its jurisdiction for six months, until May 1, 2009.  *See* "FTC Enforcement Policy: Identity Theft Red Flags Rule, 16 CFR 681.2" (available at http://www.ftc.gov/os/2008/10/081022idtheftredflagsrule.pdf. ).  In this policy statement, the Commission stated that "[t]he ECOA definition of 'credit' includes a right granted to defer payment for any purchase.  Thus, any person that provides a product or service for which the consumer pays after delivery is a creditor."  *Id*. at 1 n1.

On April 30, 2009, the Commission issued another enforcement policy statement and an additional three month delay in enforcing the rule, until August 1, 2009.  *See* "FTC Extended Enforcement Policy: Identity Theft Red Flags Rule, 16 CFR 681.1" (available at http://www.ftc.gov/os/2009/04/P095406redflagsextendedenforcement.pdf.) ("Extended Enforcement Policy"). The Commission recognized that a number of smaller entities that likely would only be subject to a low risk of identity theft had concerns about their obligations under the Rule and the Commission intended to assist those entities by preparing a template Red Flags program.  The Commission also stated in this announcement that "[i]n FACTA, Congress imported the definition of creditor from [the ECOA] for purposes of the FCRA.  The definition thus has a broad scope and may include entities that have not in the past considered themselves to be creditors.  For example, creditors under the ECOA include professionals, such as lawyers or

10

health care providers, who bill their clients after services are rendered. *Id*. at 1 n.3. The

statement further recognized that "This Rule applies to all entities that regularly permit deferred

payments for goods and services, including entities such as health care providers, attorneys, and

other professionals, as well as retailers and a wide range of businesses that invoice their

customers." *Id*. at 1.

On June 11, 2009, the agencies issued "Frequently Asked Questions: Identity Theft Red

Flags and Address Discrepancies" (available at http://www.ftc.gov/os/2009/06/

090611redflagsfaq.pdf.) to assist financial institutions, creditors, users of consumer reports and

issuers of credit cards and debit cards in complying with the new rules on identity theft and

discrepancies in changes of address. The FTC issued additional guidance for entities under its

jurisdiction: "Fighting Fraud With the Red Flags Rule. A How-To Guide for Business. The Red

Flags Rule: Frequently Asked Questions ("FAQs") (available at

http://www.ftc.gov/bcp/edu/microsites/redflagsrule/faqs.shtm). In these FAQs, the Commission

stated that "Under the Rule, the definition of "creditor" is broad and includes businesses or

organizations that regularly provide goods or services first and allow consumers to pay later.

Examples of groups that may fall within its definition are utilities, health care providers, lawyers,

accountants, and other professionals, and telecommunications companies." FAQs ¶ B.1.

The FAQs further elaborated on the types of payment plans that would or would not be

subject to the Rule. For example, where clients pay a retainer before the provision of services,

such as is often required by law firms, this arrangement does not make the law firm a "creditor"

for purposes of the Rule, because it is being paid *before* they provide services. *See* FAQs, ¶ B.5.

Similarly, law firms that bring cases on a contingency fee basis are not "creditors" under the

Rule, because the firm does not earn its fee unless and until it wins recovery for its client which

11

does not constitute a credit relationship.  *See* FAQs, ¶ B.6.  The FAQs further noted that even though attorneys who defer billing for their services are "creditors" under the Rule, if they know all their clients individually, making the likelihood that an identity thief could defraud the firm by impersonating a client extremely low, it is unlikely that Commission staff would recommend that the Commission initiate a law enforcement action.  *See* FAQs, ¶ E.3.

On July 29, 2009, the Commission announced a further three-month extension in the enforcement of the Rule, until November 1, 2009, in order to provide creditors and financial institutions – particularly small businesses and entities with a low risk of identity theft – additional time to review the agency's guidance and other resource materials in order to develop and implement their written Identity Theft Prevention Programs.  *See* "FTC Extended Enforcement Policy: Identity Theft Red Flags Rule, 16 CFR 681.1" (available at http://www.ftc.gov/os/2009/07/ P095406redflagspolicy.pdf).[11]  The July 29 announcement repeated statements made in the April 30 Extended Enforcement Policy statement that "lawyers" are covered if they "bill their clients after services are rendered," and that the "rule applies to all entities that regularly permit deferred payment for goods or services," including "attorneys." *Id*., at 1 and n.2.[12]

On August 27, 2009, the ABA filed the instant lawsuit.

---

[11]  The Commission has developed a "How-To Guide for Business," a video, and a compliance template available online specially designed to assist low risk entities develop their programs.  See www.ftc.gov/redflagsrule.

[12]  Congress is currently considering an amendment to section 615(e) of the FCRA, 15 U.S.C. § 1681m(e), to specifically exempt certain small businesses, including "a legal practice with 20 or fewer employees," from complying with the Red Flag rules and guidelines.  *See* H.R. 3763, 111th Cong. (1st Sess. 2009).

## STANDARD OF REVIEW

A party is entitled to summary judgment where "there are no genuine issues of any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986). The court, when ruling on a motion for summary judgment, must view the evidence in the light most favorable to the non-moving party and must draw all "all reasonable inferences" in the non-moving party's favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513; *Arrington v. U.S.*, 473 F.3d 329, 333 (D.C. Cir. 2006). Summary judgment is especially fitting where an issue involves statutory construction. *Helm v. State of California*, 722 F.2d 507, 509 (9th Cir. 1983); *see also Troy Corp. v. Browner*, 120 F.3d 277, 281 (D.C. Cir. 1997) (summary judgment appropriate to determine agency compliance with the APA).

The plaintiff's allegations in Count I of the complaint challenge the Commission's authority to subject attorneys to the Red Flags Rule, and therefore constitutes a challenge under 5 U.S.C. § 706(2)(C), which requires a court to hold unlawful and set aside agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." Disputes implicating an agency's construction of a statute it administers are ordinarily subject to the two-step process articulated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778 (1984). First, a court considers whether Congress spoke directly to the question at issue; if so, "that is the end of the matter, for the court, as well as the agency must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842-43, 104 S.Ct. at 2781. If, however, the statute is unclear or ambiguous on the issue to be resolved, the question for the court is whether the agency's answer is based on a permissible construction of the statute. 467 U.S. at 843, 104 S.Ct. at 2782. In answering that question, "considerable weight

13

should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer" because the agency decision as to the meaning of a statute involves "reconciling conflicting policies . . . and more than ordinary knowledge respecting the matters subjected to agency regulation." 467 U.S. at 844, 104 S. Ct. at 2782-83 *(quoting United States v. Shimer,* 367 U.S. 374, 382 , 383 (1961)).  In doing so, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* Deference to the agency's statutory interpretation under *Chevron* is warranted where "Congress has left a gap for the agency to fill pursuant to an express or implied 'delegation of authority to the agency.'" *ABA v. FTC*, 430 F.3d 457, 468 (D.C. Cir. 2005) (citation omitted).

*Chevron* deference is appropriate in the present case because the Commission's determination that lawyers may qualify as "creditors" under the FCRA and the Red Flags Rule is based on the Federal Reserve Board's definitive and long-standing interpretation of "credit" and "creditor" under the ECOA, and the FCRA directly incorporated the ECOA definition.  FRB staff opinions construing one of its statutes or implicating regulations "[u]nless demonstrably irrational . . . should be dispositive."  *Ford Motor Credit Co., v. Milhollin*, 444 U.S. 555, 565, 100 S. Ct. 790, 797 (1980).

Further, to the extent the Commission's application of the Red Flags Rule to attorneys as reflected in the April 30 Extended Enforcement Policy is construed as an interpretation of the Rule, this interpretation is "controlling unless 'plainly erroneous or inconsistent with the regulation.'"  *Auer v. Robbins*, 519 U.S. 452, 461, 117 S. Ct. 905, 911 (1997) (*quoting Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359, 109 S. Ct. 1835, 1850 (1989)).

14

## ARGUMENT

**THE FACT ACT'S DEFINITION OF "CREDITOR" APPLIES TO ATTORNEYS WHO BILL THEIR CLIENTS AFTER PROVIDING LEGAL SERVICES**

The Commission's application of the Red Flags Rule to attorneys who allow their clients to pay for legal services after the services have been rendered is based on the plain language of the FACT Act, and the consistent and long-standing interpretation of the incorporated language from the ECOA by the FRB, the agency charged with its implementation. The statutory language mandates that *any* entity – regardless of the business in which it engages – that provides goods or services first and allows its customers or clients to pay later, is subject to the identity theft provisions of the Red Flags Rule. The ABA's near-total reliance on *ABA v. FTC*, 430 F.3d 457 (D.C. Cir. 2005) is misplaced. Finally, there are good policy reasons for subjecting attorneys who do not require immediate payment to the Rule in order to protect victims whose rights may be severely affected by identity theft in connection with the provision of legal services. For all these reasons, the ABA's motion should be denied.

A. <u>The Commission was simply following the plain language in the FACT Act to subject attorneys who defer payment to the Red Flags Rule</u>

In subjecting attorneys to the Rule, the Commission was simply following the plain definition of "creditor" in the FACT Act to cover *any* entity who regularly defers payment when it provides goods or services. Thus, attorneys who bill their clients after they provide legal services are plainly "creditors" subject to the Red Flags Rule.

The starting point in construing the meaning of a statute is the language of the statute itself. *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 210, 99 S. Ct. 1067, 1073 (1979). As noted above, the definition of "creditor" in the FCRA incorporates the definition from the Equal Credit Opportunity Act ("ECOA"). *See* 15 U.S.C. § 1681a(r)(5). The ECOA defines

15

"creditor" as "any person who regularly extends, renews or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew or continue credit."  15 U.S.C. § 1691a(e).  "Credit," in turn, is defined in the ECOA as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor."  15 U.S.C. § 1691a(d).  The definition of "creditor" under the ECOA is therefore based on a business's billing arrangements, not the nature of the underlying goods or services it supplies.  The statutory language provides no support for the exemption of any industry or profession.

Courts have consistently applied the plain language of the ECOA – on which the FCRA's definition is based  –  to conclude that any entity that provides the right to a customer or client to defer the payment of a debt, or to defer payment after the purchase of property or services, extends "credit" and is therefore subject to the Act.  *See, e.g., Mays v. Buckeye Rural Electric Cooperative,* 277 F.3d 873, 876, 878-79 (6th Cir. 2002) (nonprofit electrical utility cooperative extended credit and is therefore subject to the ECOA); *Mick v. Level Propane Gases, Inc.,* 183 F. Supp. 2d 1014 (S.D. Ohio 2000) (propane gas supplier is a "creditor" for purposes of the ECOA because it provides "deferred payment for propane services"); *Williams v. AT&T Wireless Servs*., 5 F. Supp. 2d 1142, 1145-47 (W.D. Wash. 1998) (application for cellular phone service is a "credit" transaction for purposes of ECOA because "the consumer incurs debt as he uses the services and is billed for the services on a periodic basis"); *In re Brazil*, 21 BR 333, 334 (Bank. N.D. Ohio 1982) (public gas utility "is a creditor as it regularly provides gas to its customers, prior to being paid therefore."); *see also Barney v. Holzer Clinic,* 110 F.3d 1207, 1209-10 (6th Cir.

16

1997) (holding that, while plaintiffs were not "applicants" for credit under facts of case, the deferral of payment characterizes a "credit transaction" under the ECOA).[13]

Cases that have concluded that a particular transaction did not involve "credit" similarly applied the ECOA definition to determine if there was a right to defer debt or payments, and concluded there was not if the payments were made contemporaneously with the services.  *See, e.g.*, *Laramore v. Ritchie Realty Management Co.*, 397 F.3d 544, 547-48 and n.3 (7th Cir. 2005) (relying on "persuasive" FRB official staff interpretation to hold that typical residential lease is not a credit transaction because it involves the "contemporaneous exchange of consideration"); *Shaumyan v. Sidetex, Co.*, 900 F.2d 16, 18-19 (2d Cir. 1990) (concluding that "incremental" payments made in connection with home improvement contract did not constitute a "credit transaction" under the ECOA because they were made "substantially contemporaneous with [the company's] performance under contract"); *Liberty Leasing Co. v. Machamer*, 6 F. Supp. 2d 714, 717 (S.D. Ohio 1998) (holding that equipment lease was not a credit transaction under the ECOA because provided for contemporaneous exchange of consideration for use of equipment).  All of these cases focused on the plains terms for "credit" and "creditor" under the ECOA and none suggested that the ECOA contains any industry-based exemptions.  Clearly, whether an entity extends "credit" is fact-specific and must be determined on a case-by-case basis.

It must be presumed that the Congress that enacted the FACT Act – and that specifically adopted the ECOA definition of "credit" and "creditor" – knew of and accepted the broad judicial

---

[13]  *See also* Theodore Eisenberg, 1-5 Debtor-Creditor Law § 5.02 (Matthew Bender & Co., Inc., 2008) ("Because credit under the ECOA involves any simple deferral of payment, even if there are no finance charges or installments, the ECOA applies to many transactions where the consumer pays after receiving the goods or services, such as doctor and hospital bills, bills from repair persons and other workers, and even a local store where a customer runs up a tab.").

interpretations when incorporating the ECOA's definitions into the FACT Act.  *See Dresser Industries, Inc. v. United States*, 238 F.3d 603, 614 n.9 (5th Cir. 2001).  Indeed, the FACT Act's legislative history clearly shows that Congress very intentionally chose the broad ECOA definitions for "credit" and "creditor" for purposes of the FCRA, having rejected narrower definitions in earlier bills.[14]  There is a "heavy presumption against implicit exemptions" from federal laws, particularly those protecting consumers.  *See Jefferson County Pharm. Assoc. v. Abbott Laboratories,* 460 U.S. 150, 157-58, 103 S.Ct. 1011, 1017-18 (1983) (citations omitted); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 787, 95 S.Ct. 2004, 2013 (1975).

As a consequence of the broad coverage mandated by the statutory language, many individuals and entities that are not traditional financial service providers are "creditors" under the FACT Act.  But this result is consistent with the broad antidiscrimination purpose behind the ECOA to eradicate discrimination in all credit-related situations.[15]

---

[14]  Earlier versions of the Red Flags legislation imposed the requirements on a substantially narrower group of entities than the "financial institutions" and "creditors" incorporated from the ECOA.  For example, the House bill proposed amending the FCRA to require "insured depository institutions" to establish procedures to identify possible instances of identity theft.  *See* H.R. Rep. No. 108-263, at 42 (2003), H.R. 2622 § 206.  Similarly, a version of the Senate bill proposed amending the FCRA to incorporate the narrower definitions of "credit" and "creditor" from Section 103 of the Truth in Lending Act.  *See* S. 1753, 108th Cong. §§ 111(u) and 114 (1st Sess. 2003).  The conference report (H.R. Rep. No. 108-396, at 4 (2003) (Conf. Rep.), *as reprinted in* 2003 U.S.C.C.A.N. 1753), made it clear that the definitions of "credit" and "creditor" would be incorporated from Section 702 of the ECOA.

[15]  The ABA's argument that other terms used in 15 U.S.C. § 1681m that denote a more financial context, such as "account holder" or "customer," mean that Congress did not intend to include lawyers within that provision, Memorandum of Points and Authorities in Support of Plaintiff's Motion for Partial Summary Judgment ("ABA Br.") at 23-24, is misplaced.  The focus of this provision is on the financial context because it precisely where credit is being extended and no payments are required up-front that identity theft is more likely.  In this context, attorneys who defer payments fall neatly within the term "creditor" if they defer payments.  Further, as noted above, Congress intentionally rejected proposals to limit the term "creditor" to more narrow financial-related entities, such as insured depository institutions.  *See supra* at 18 n.14.

The cases relied upon by the ABA, ABA Br. at 19-21, fail to support their case. For example, in *Riethman v. Berry,* 287 F.3d 274 (3d Cir. 2002), a client and his new wife sued their former attorneys over a fee dispute that arose in a child custody case. The plaintiffs asserted that the attorneys' fee agreement did not comply with the ECOA and the Truth in Lending Act. The district court granted summary judgment in favor of the attorneys and dismissed the plaintiffs' suit. In affirming the district court on appeal, the Third Circuit found that, based on the facts in that case, the defendant lawyers were not "creditors" under the ECOA, because "the express terms of their fee arrangements plainly manifest their right to prompt and full payments," and therefore there was no right to make deferred payment. 287 F.3d at 277-78. The court also concluded that, because the fee arrangements at issue did not extend credit, the failure of the lawyers to enforce them strictly "was not the continuance of existing credit." 287 F.3d at 279. However, the Court did not foreclose subjecting attorneys to the ECOA if the facts showed that they did defer the payment of legal bills; indeed, the Court stated that "[w]e do not suggest that lawyers are *ipso facto* exempt from the statute." 287 F.3d at 278. Moreover, while the Court looked with disfavor on subjecting professionals' fees to the ECOA, *id.*, it entirely failed to recognize the official FRB staff commentary for Regulation B which, as discussed below, expressly subjects professionals, such as lawyers and doctors, to the ECOA if they "defer

---

Similarly, it is immaterial that the Red Flag Rule's definition of "creditor" under 16 C.F.R. § 681.1(b)(5) does not specifically mention lawyers while it does expressly include "lenders such as banks, finance companies, automobile dealers, mortgage brokers, utility companies, and telecommunications companies." *See* ABA Br. at 24. The list is merely illustrative and not exhaustive. *See e.g., Puerto Rico Maritime Shipping Auth. v. ICC*, 645 F.2d 102, 112 n.26 (D.C. Cir. 1981) ("It is hornbook law that the use of the word 'including' indicates that the specified list . . . that follows is illustrative, not exclusive.") (citation omitted).

payment for services." *See infra* at 21-23.  These official FRB staff opinions are to be considered "authoritative" and "dispositive."  *See infra* at 23.

The ABA also relies upon *Mick's at Pennsylvania Avenue, Inc. v. BOD, Inc.*, 389 F.3d. 1284 (D.C. Cir. 2004), a case that did not involve attorneys.  In *Mick's,* a sublessor of restaurant premises sued a sublessee and its guarantors to recover moneys owed.  One sublessee argued that the sublessor violated the ECOA and Regulation B by requiring him to co-sign sublease and guaranty for his wife's restaurant although he was not himself a principal of the sublessee.  The district court granted summary judgment for the sublessor and one of the sublessee's guarantors appealed.  In affirming on appeal, the Court of Appeals for the D.C. Circuit held, based on the undisputed facts in that case, that the sublessor did not violate the ECOA because "There is no evidence that either Mick's or Morton's, each of which is in the restaurant business, 'regularly' extends or arranges credit . . ." 389 F.3d at 1289.  *Mick's* did not suggest that restauranteurs – or any other group such as lawyers – are categorically exempt from the ECOA regardless of the nature of the billing or payment arrangement.[16]

Thus, the authorities the ABA relies upon provide no support for blanket exemptions from the ECOA and the FACT Act.  Rather, they simply reflect that the determination whether a particular billing arrangement constitutes the extension of "credit" must be determined on a case-by-case basis, depending on the facts.  But the Commission has already acknowledged that

---

[16]  Similarly, *Lewis v. ACB Business Services, Inc.*, 135 F.3d 389, 408 (6th Cir. 1998), relied upon by the ABA, ABA Br. at 20, is inapposite.  In *Lewis*, the Sixth Circuit merely held that an offer to settle a case by a attorney (where the complaint merely made a bare unsupported legal conclusion that the attorney was a "creditor" under the ECOA) does not amount to an offer of credit to subject the attorney as a "creditor" under that statute.  The Court did not say that the deferral of payment by the attorney to a client would fall outside of the ECOA or that attorneys can never be subject to the ECOA.

lawyers who do not defer payment for their services are not covered under the ECOA and are not

subject to the Red Flags Rule.  For example, attorneys who receive a retainer from their client are

paid *prior* to rendering their legal services and therefore are not deemed "creditors" for purposes

of the Rule. *See* FAQs, ¶ B.5.[17]  Similarly, attorneys who work on a contingency basis are not

deemed "creditors" under the Rule because the fee arrangement cannot be considered an

extension of credit.  *See* FAQs, ¶ B.6.  In the event that the Commission institutes enforcement

actions against attorneys based on Red Flags Rule violations, such attorneys will be free to make

arguments that their billing arrangements do not trigger coverage.  But the ABA's arguments for

a blanket exemption are baseless.

> B.  The official FRB staff interpretation that lawyers that defer payment of a bill are creditors under the ECOA (and therefore the FACT Act) is "authoritative" and dispositive of this case

Significantly, the ABA essentially ignores an official staff interpretation by the Board of

Governors of the Federal Reserve Bank ("FRB") – the agency charged with implementing the

ECOA – that lawyers who defer debt are "creditors" for purposes of the ECOA.  This

interpretation, which is deemed to be "authoritative," should be given great deference by the

courts.

The ECOA delegates to the FRB the authority to issue implementing regulations to carry

out the purpose of the ECOA.  15 U.S.C. § 1691(b).  The FRB issued the implementing

regulation, "Regulation B," 12 C.F.R. §§ 202.1 - 202.17 (2009).  The FRB has authorized

---

[17]  The ABA argues that this position is inconsistent with the Commission's general assertion that payment after the provision of legal services constitutes "credit," because a retainer cannot be paid until after services are provided.  ABA Br. at 22.  However, presumably fees held in a retainer agreement are paid essentially contemporaneously with the provision of the legal services which, under the governing case law, does not constitute "credit" under the ECOA.

officials in its Division of Consumer and Community Affairs to issue official staff interpretations of regulations and, except in unusual circumstances, such interpretations are incorporated in an official commentary to the regulation.  *See* 12 C.F.R. pt. 202, Supp. I (prefatory paragraph and introduction).

The FRB, in its Official Staff Commentary to Regulation B, makes clear that the terms "credit" and "creditor" under the ECOA are to be construed broadly so as to include all entities that defer payments, even in the normal course of a traditional billing process.  *See, e.g.,* 12 C.F.R. pt. 202, Supp. I, § 202.1, ¶ 1(a) (recognizing that the term "credit" under the ECOA, applies "to all credit – commercial as well as personal – without regard to the nature or type of the credit *or the creditor*," and encompasses any "deferral of the payment of a debt," is intentionally broader than the definition of "credit" under the Truth in Lending Act) (emphasis added); 12 C.F.R. pt. 202, Supp. I, § 202.2(j) (the scope of credit transactions covered under Regulation B is broader than those covered in other sections of the CCPA).

Nearly 25 years ago, FRB staff first announced in an Official Staff Commentary, in providing examples of service providers who provide "incidental credit" under 12 C.F.R. 202.3-3(c), that lawyers should be included as extending credit if they "defer the payment of a [legal] bill."  *See* 12 C.F.R. pt. 202, Supp. I, 50 Fed. Reg. 48,018, 48,049 (Nov. 20, 1985), 1985 WL 126616.  The FRB has consistently and publicly kept to this position.

The current version of the Official Staff Commentary states that:

"[i]f a service provider (such as a hospital, doctor, *lawyer*, or merchant) allows the client or customer to defer the payment of a bill, this deferral of a debt is credit for purposes of the regulation, even though there is no finance charge and no agreement for payment in installments."

12 C.F.R. pt. 202, Supp. I, § 202.3, ¶ 3(c) (emphasis added).

Thus, it could not come as a great surprise to attorneys that the FTC would adopt for purposes of the Red Flags Rule the FRB's interpretation of "credit" under the ECOA to include lawyers if they defer payment for services.  As the agency with governing authority over the ECOA, the FRB's interpretation of that statute should be afforded substantial deference. *Chevron,* 467 U.S. at 844, 104 S. Ct. at 2782.  For the same reasons, the FRB staff interpretations of Regulation B should be given substantial deference.  *Nevarez v. O'Connor Chevrolet, Inc.*, 303 F. Supp. 2d 927, 938 (N.D. Ill. 2004).

The Supreme Court has specifically held that FRB staff opinions construing one of its statues or implicating regulations "[u]nless demonstrably irrational . . should be dispositive." *Ford Motor Credit Co., v. Milhollin*, 444 U.S. 555, 565, 100 S.Ct. 790, 797 (1980).  In *Milhollin*, the Court reversed the Court of Appeals and held that a credit card company was not liable to its customers under TILA or its implementing Regulation Z for failing to disclose an acceleration clause and its effect on unearned interest.  In so doing, the Court relied substantially on the views expressed in an FRB official staff interpretation construing TILA and Regulation Z.  The Court held that "Congress delegated broad administrative lawmaking power to the Federal Reserve Board when it framed TILA."  444 U.S. at 566, 100 S. Ct. at 797.  The Court elaborated: .

> [J]udges ought to refrain from substituting their own interstitial lawmaking for that of the Federal Reserve, so long as the latter's lawmaking is not irrational.  Finally . . . deference to the Federal Reserve is compelled by necessity; a court that tries to chart a true course to the Act's purpose embarks upon a voyage without a compass when it disregards the agency's views.

444 U.S. at 568, 100 S. Ct. at 798.  These principles apply equally to the ECOA, which, like the TILA, is part of the CCPA and contains a provision parallel to the one at issue in *Milhollin*.[18]

---

[18]  *Milhollin* involved a TILA provision providing a good faith defense to creditors relying on an interpretation by FRB personnel, 15 U.S.C. § 1640(f).  The ECOA contains an

Thus, under *Milhollin*, FRB staff's interpretation that lawyers who defer payments are subject to the ECOA must be deemed "authoritative" and therefore "dispositive" on the issue.

Further, as noted above, FRB staff first announced in 1985 that lawyers were subject to the ECOA if they allowed their clients to defer payments of a bill and staff has consistently maintained this position. Since 1985, Congress has amended the ECOA several times and never sought to exclude attorneys from coverage. *See* Pub. L. No.104-208, 110 Stat. 3009-420 (Sept. 30, 1996) (adding 15 U.S.C. § 1691c-1); Pub. L. No. 104-88, 109 Stat. 948 (Dec. 29, 1995) (revising 15 U.S.C. § 1691c); Pub. L. No. 102-550, 106 Stat. 4082 (Oct. 28, 1992) (revising 15 U.S.C. § 1691c); Pub. L. No. 102-242, 105 Stat. 2300 (Dec. 19, 1991) (revising 15 U.S.C. §§ 1691, 1691e); Pub. L. No. 101-73, 103 Stat. 439 (Aug. 9, 1989) (revising 15 U.S.C. § 1691c); Pub. L. No. 100-533, 102 Stat. 2692 (Oct. 25, 1988) (revised 15 U.S.C. § 1691b). "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it reenacts a statute without change." *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Curran*, 456 U.S. 353, 382 n.66, 102 S. Ct. 1825, 1841 n.66 (1982) (citation omitted).

Here, Congress not only reenacted the ECOA subsequent to the FRB staff's authoritative interpretation of "creditor," but adopted the ECOA definition in the FACT Act itself. "[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Id.*

Courts have relied upon the FRB's Official Staff Commentary to Regulation B to hold that the broad interpretation of the ECOA term "creditor" encompasses any entity extending

---

analogous provision, 15 U.S.C. § 1691e(e).

"credit."  *See, e.g., Laramore,* 397 F.3d at 547-48 n. 3 (relying on "persuasive" FRB official staff

interpretation); *Barney v. Holzer,* 902 F. Supp. 139, 141 & n.3 (S.D. Ohio 1995) (noting that the

FRB staff interpretation of ECOA to categorize delayed billing for medical expenses as a type of

credit should "govern" under *Chevron*), *aff'd as modified,* 110 F.3d 1207 (6th Cir. 1997);

*Williams*, 5 F. Supp. 2d at 1145 (citing to the FRB official staff interpretation to hold that

plaintiffs' application for cellular telephone service constituted credit).  The FRB staff's long-

standing and consistent official interpretation that attorneys who defer the payments of their legal

bills are subject to the ECOA – and therefore the Red Flags Rule – deserves substantial deference

by this Court.

      C.   Neither the *ABA-GLBA* case nor the Clear Statement Rule compels granting the
            ABA's motion

      In its supporting legal memorandum, the ABA places great reliance on the "clear

statement rule" and the decisions of this Court and the Court of Appeals for District of Columbia

circuit in *ABA v. FTC*, 430 F.3d 457 (D.C. Cir. 2005), *aff'g*, *N.Y. State Bar Ass'n v. FTC*, Civil

Action No. 02-810 (RBW), 2004 WL 964173 (D.D.C. Apr. 30, 2004) ("*ABA-GLBA*").  *See* ABA

Br. at 13-18.  As the Supreme Court recognized in *Gregory v. Ashcroft*, 501 U.S. 452, 461, 111 S.

Ct. 2395, 2401 (1991), the "plain statement rule is nothing more than an acknowledgment that the

States retain substantial sovereign powers under our constitutional scheme, powers with which

Congress does not readily interfere."  *Amicus* American Association for Justice ("AAJ") makes

the related argument that subjecting attorneys who defer billing their clients to the Red Flags Rule

impermissibly intrudes into an area exclusively reserved to the States.  *See* AAJ Br. at 5-9.  The

Commission acknowledges that the States retain primary responsibility for regulating the

practice of law.  However, neither the plain statement rule nor the *ABA-GLBA* case compels a decision in the ABA's favor.

In *ABA-GLBA*, the ABA and the New York State Bar Association challenged the Commission's characterization of attorneys as "financial institutions" under the privacy provisions of the Gramm-Leach-Bliley Act  ("GLBA"), 15 U.S.C. § 6801, *et seq*.  The GLBA required "financial institutions" to send out privacy notices regarding their policies to disclose and protect their customers' nonpublic personal information ("NPI"), and to provide the customer the choice to "opt out" of the disclosure of NPI.  *See id*., §§ 6803, 6802(b).  The GLBA defined "financial institution" as "any institution the business of which is engaging in financial activities as described in section 1843(k) of Title 12 [the Bank Holding Company Act of 1956 ("BHCA")]. *Id.* § 6809(3)(A).  Section 1843(k)(4) lists various activities as "financial in nature," including activities listed in a very detailed regulation, known as "Regulation Y," issued under the BHCA by the FRB, 12 C.F.R. § 225.28 (2000).  The agencies issued a joint rulemaking implementing these GLBA provisions.  *See* 16 C.F.R. pt. 313 (FTC's rule).

After the Commission denied an exemption request from the bar associations, the associations filed suit.  This Court denied the Commission's motions to dismiss and then granted the bar associations' motions for summary judgment.  *See N.Y. State Bar Ass'n v. FTC*, 276 F. Supp. 2d 110, 136 (D.D.C. 2003); *N.Y. State Bar Ass'n v. FTC*, 2004 WL 964173, 2004-1 Trade Cases ¶ 74,383 (D.D.C. April 30, 2004).  The Court of Appeals affirmed, first holding that the GLBA was not ambiguous as to whether the attorneys are covered under step one of C*hevron,* because, *inter alia*, the statute's "layers of incorporated statutory and regulatory language describing financial institutions make[ ] an exceptionally poor fit," with the Commission's decision to subject lawyers to the GLBA, and that "[a]n attorney, or even a law firm, does not fit

26

very neatly into the niche of a 'financial institution.'" *ABA v. FTC*, 430 F.3d 457, 468-71 (D.C. Cir. 2005). The Court then held, that even if there was ambiguity, the Commission's interpretation would fail step two of *Chevron*, because "[i]t is undisputed that the regulation of the practice of law is traditionally the province of the states. Federal law may not be interpreted to reach into areas of State sovereignty unless the language of the federal law compels the intrusion." 430 F.3d at 471-72 (citation omitted). For the following reasons, the *ABA-GLBA* case does not control here.

     1.  <u>The Commission's application of the Red Flags Rule to lawyers who regularly defer payments flows naturally from the statutory language, Supreme Court precedent, and consistent administrative interpretation</u>

In the *ABA-GLBA* case, both this Court and the Court of Appeals were clearly troubled by the complexity of determining the activities that subjected attorneys to the GLBA, as well as by the awkwardness of defining a law firm or an attorney (particularly a solo practitioner) as a "financial institution" under the GLBA. *See* 430 F.3d at 470-71; 276 F.Supp. 2d at 118-19. With this background, the courts found notable that Congress had not expressly included lawyers within the GLBA regime. The background to the Red Flags definition of "creditor" is far different.

First, as shown above, the FRB, the federal regulatory agency charged by Congress to administer the ECOA, has for nearly 25 years concluded that lawyers who defer the payment of a bill are subject to that Act as a "creditor." *See* 12 C.F.R. pt. 202, Supp. I, § 202.3 ¶ 3(c). Congress is presumed to have endorsed that position, having never exempted attorneys from the coverage of the ECOA, even though it amended the ECOA multiple times since 1985, and then expressly incorporating the ECOA's broad definition of "creditor" into the FACT Act.

Moreover, here the FACT Act and the Red Flags Rule adopted the broad and straightforward definition of "creditor" from the ECOA that covers "any person who regularly extends, renews or continues credit . . .," and contains no exceptions.  15 U.S.C. § 1691a(e).  Lawyers – like any other service provider – who regularly defer the payment for their legal services fall naturally within the scope of that definition.  Here, unlike the *ABA-GLBA* case, there is no incorporation of a particularly detailed regulatory scheme to determine if a lawyer is covered.  *See* 430 F.3d at 460.  Rather, a lawyer who does not demand immediate payment from his client "extends . . . credit" under a straightforward and natural meaning of those terms.  Plaintiffs cannot reasonably dispute that if a lawyer provides services to a client and does not request immediate payment, she is "defer[ing] payment" of the debt.  *See* The American Heritage Dictionary 375 (2d College ed. 1982) ("defer" is defined as "[to] put off until a future time; postpone").  This is not a case where an elephant (or even a more modest sized creature) is hiding in a mousehole.

While the ABA argues that attorneys as an entire profession are *ipso facto* exempt from the Red Flags Rule because the word "attorneys" does not appear in the FACT Act's definition of "creditor," this case is governed by a long line of authority holding that the activities of  lawyers that fall within statutory language are subject to the statute unless their inclusion would be clearly contrary to the legislative text, purpose, and history.  This is particularly true where the Supreme Court has subjected attorneys' activities to other sections of the Consumer Credit Protection Act, the same umbrella statute that contains the FACT Act.

In *Heintz v. Jenkins*, 514 U.S. 291, 115 S. Ct. 1489 (1995), a unanimous Court held that lawyers are subject to federal coverage when their activities fall within the plain terms of the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. § 1692a.  In *Heintz*, a debtor brought a

28

case against an attorney representing a creditor in litigation alleging false representation in correspondence.  Applying the plain statutory definition of "debt collector" under the Act, the Court held that the FDCPA applies to the litigating activities of lawyers because "[i]n ordinary English, a lawyer who regularly tries to obtain payment of consumer debts through legal proceedings is a lawyer who regularly 'attempts' to 'collect' those consumer debts.  514 U.S. at 294, 115 S. Ct. at 1491; *see also* 514 U.S. at 297, 115 S. Ct. at 1492 (". . . litigating, at first blush, seem simply one way of collecting a debt."). The Court refused to imply an exception for lawyers' debt collecting activities from the FDCPA, holding that "nothing either in the Act or elsewhere indicat[es] that Congress intended to authorize the FTC to create this exception from the Act's coverage . . . [that] falls outside the range of reasonable interpretations of the Act's express language."  514 U.S. at 298, 115 S. Ct. at 1492-93.

The holding in *Heintz* is particularly illustrative because it construed the FDCPA which is – like the FCRA and ECOA – part of the same comprehensive umbrella statute, the CCPA. These different titles of the CCPA should be construed similarly "as a whole and not as separate unrelated parts."  *Brothers v. First Leasing,* 724 F.2d 789, 794-95 (9th Cir. 1984).  Further, both the FDCPA and the ECOA use the same broad language to cover "any person" who engages in the defined activity and thus should be construed similarly.  *Compare* 15 U.S.C. § 1691a *with* 15 U.S.C § 1692a.

The Supreme Court has not hesitated to subject attorneys or bar associations to other federal statutes when their activities fall within the scope of that law.  For example, in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S. Ct. 2004 (1975), the Court held that services performed by attorneys in examining titles in connection with financing the purchase of real estate are subject to the Sherman Antitrust Act, 15 U.S.C. § 1.  The Court held that a minimum-fee schedule

29

for lawyers for title examinations published by a county bar association and enforced by the state

bar amounted to illegal price-fixing.  In so doing, the Court rejected the bar association's

argument that the practice of law was categorically exempt from the Sherman Act as a "learned

profession" due to the existence of state bar regulation, noting that "whether state regulation is

active or dormant, real or theoretical, lawyers would be able to adopt anticompetitive practices

with impunity.  We cannot find support for the proposition that Congress intended any such

sweeping conclusion.  The nature of an occupation, standing alone, does not provide sanctuary

from the Sherman Act . . ."  421 U.S. at 787, 95 S. Ct. at 2013.  The Court noted that Section 1 of

the Sherman Act contains no exemption for attorneys and that the Court had "repeatedly

established that there is a heavy presumption against implicit exemptions."  *Id.*

In making its holding, the Court acknowledged that it "intended no diminution of the

authority of the State to regulate its professions," recognizing "that the States have a compelling

interest in the practice of the professions within their boundaries . . . have broad power to

establish standards for licensing practitioners and regulating the practice of professions," and that

such interest "is especially great" for the regulation of lawyers.  421 U.S. at 792-93, 95 S. Ct. at

2016.  Nonetheless, it held that the minimum-fee schedule published by the county bar

association violated the antitrust laws.[19]  *See also FTC v. Superior Court Trial Lawyers Assoc.*,

493 U.S. 411, 110 S. Ct. 768 (1990) (boycott by group of court-appointed attorneys for indigent

defendants violated antitrust laws as constituting a  prohibited horizontal agreement among

competitors).

---

[19]  Amicus AAJ's reliance on *Goldfarb*, AAJ Br. at 7, is particularly ironic given that the Court held that a county bar minimum-price scheme violated federal law while acknowledging the historic power of the state to regulate lawyers.  421 U.S. at 792, 95 S. Ct. at 2016.

Courts have likewise subjected attorneys to other federal statutes when their activities fall within the statutory coverage, particularly where the statues contain broad coverage over "any person." *See, e.g.*, *Wyatt v. Cole*, 504 U.S. 158, 112 S. Ct. 1827 (1992) (federal civil rights law); *Hishon v. King & Spalding*, 467 U.S. 69, 104 S. Ct. 2229 (1984) (federal antidiscrimination law); *Duncan v. Handmaker*, 149 F.3d 424 (6th Cir.1998) (Fair Credit Reporting Act); *Crowe v. Henry*, 43 F.3d 198 (5th Cir.1995) (Racketeer Influenced and Corrupt Organizations Act); *Kline v. First Western Government Securities, Inc.*, 24 F.3d 480 (3d Cir.1994) (federal securities laws); *Jenkins v. Landmark Mortgage Corp. of Virginia*, 696 F. Supp. 1089 (W.D. Va. 1988) (Truth in Lending Act); *Foley, Hoag & Eliot*, 229 NLRB 456 (1977) (federal collective bargaining law). *See generally* Restatement (Third) of the Law Governing Lawyers § 56 (2000).

In *ABA-GLBA*, this Court was not convinced that lawyers were covered by the GLBA based on the Commission's arguments that lawyers were subject to other federal statutes, mainly because the other cited statutes (except one) covered a much broader set of entities than the constrained definition of "financial institutions" under the GLBA. *See* 276 F. Supp. 2d at 133-34. Here, however, the ECOA's definition of "creditor" includes "any person" who engages in the defined activities, *see* 15 U.S.C. § 1691a(e), in exactly the same broad manner as *Heintz, Goldfarb, Superior Court Trial Lawyers,* and the other cited cases.

      2.  <u>The Red Flags Rule does not intrude into a core state function regulating a lawyer's relationship with her client</u>

This Court recognized in the *ABA-GLBA* case that the issue concerned whether Congress intended to impose on lawyers the GLBA confidentiality provisions to protect against the unauthorized disclosure of their clients' nonpublic personal information. *See* 276 F.Supp. 2d at 122-23. The Court noted that "the most convincing evidence that supports the plaintiff's position

31

that Congress did not intend for the GLBA to cover attorneys is the absence of any explicit

statement by Congress that it intended to legislate in an area *that was already regulated by*

*existing state regulatory schemes*." *Id*. at 124 (emphasis added). The Court then analyzed the

Model Rule and Model Code that govern professional conduct, as well as state ethical rules, and

concluded that "these state and local regulatory schemes . . . already provide protection against

disclosure of clients' personal information to third parties by attorneys." *Id.* at 129-30. The

Court compared the GLBA's privacy protections, including notices, to state regulatory schemes

that "already provide greater protection with respect to the dissemination of clients' financial

information . . ." *Id.* at 130-31. The Court's holding was thus based at least in part on its

conclusion that the GLBA's privacy protections intruded into a core area already regulated by

state bar regimes and added little to state law client confidentiality protections.

In contrast, neither the ABA nor *amicus* AAJ point to state bar rules that are specifically

designed to protect the victims of identity theft as do Section 114 of the FACT Act, 15 U.S.C.

§ 1681m, and the Red Flags Rule. Thus, the ABA cannot argue, as it did in the GLBA suit, that

Congress did not intend to cover attorneys due to an already comprehensive existing state bar

regime, because here there is simply no similar set of protections governing non-clients, such as

the victims of identity theft in whose name the services are sought. Further, subjecting attorneys

to the Red Flags Rule is based on the attorney's billing arrangement with clients – essentially an

accounting function – and not on some essential element of the lawyer-client relationship, such as

the protection of client confidences.

The Commission is not intruding into the states' prerogative to regulate "the practice of

law" or into any other essential core state function. Rather, the Commission is simply following

the Congressional directive to protect identity theft victims, by applying the Red Flags protections

to those instances which make the attorney-client relationship most susceptible to identity theft, *e.g.*, when the client is not required to pay immediately for the legal services rendered.

>   D.  <u>Subjecting attorneys to the Red Flags Rule does not "preempt" state law, but rather makes attorneys who permit deferred payments subject to both set of rules</u>

*Amicus* AAJ argues that the Commission is improperly preempting the states' regulation of attorneys.  AAJ Br. at 5-9.  Congress certainly has the authority if it so intends to regulate matters in the states directly, "including in areas in areas of intimate concern to the States," and to preempt contrary state regulation.  *See New York  v. U.S.,* 505 U.S. 144, 162, 178, 112 S.Ct. 2408, 2421, 2429 (1992); *Fraternal Order of Police v. U.S.,* 173 F.3d 898, 907 (D.C. Cir 1999) (the Tenth Amendment does not forbid "federal regulation of 'core' areas of state sovereignty," relegating to the political process the states' protection from undue intrusion in this form).  There is no such preemption here, however.

Except where Congress either expressly or impliedly preempts a state law by exclusively occupying the field, federal law will preempt a state law only where the state enactment frustrates the purpose of the federal act or where compliance with both the federal and state laws is physically impossible.  *See Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372-73, 120 S. Ct. 2288, 2275-76 (2000); *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 873, 120 S. Ct. 1913, 1921 (2000); *English v. General Elec. Co.*, 496 U.S. 72, 78-79, 110 S. Ct. 2270, 2275 (1990).  Here, lawyers can easily comply with both their Red Flags and state confidentiality obligations as part of a "dual regulatory scheme."  *See Northwest Central Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 514-18, 109 S. Ct. 1262, 1276-78 (1989); *Pacific Gas & Elec. Co. v. State Energy Resources Conserv. & Dev. Comm'n*, 461 U.S. 190, 218-19, 103 S. Ct.

1713, 1729-30 (1983); *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43, 83 S. Ct. 1210, 1217 (1963).

Neither the ABA nor the *amicus* AAJ has alleged that anything in the Red Flags Rule requires conduct that is otherwise prohibited by state bar rules nor that anything in the state law would violate the FACT Act or the Red Flags Rule.  Indeed, neither the ABA nor the AAJ has made any showing that state bar rules protect the *victims* of identity theft that the Red Flags Rule was designed to protect.[20]   For these reasons, the cases relied upon by the AAJ in support of the presumption against preemption are inapposite.[21]

E. Granting plaintiff's motion in this facial challenge would exempt all attorneys from the Red Flags Rule in all circumstances regardless of their billing arrangements or the circumstances of the identity theft

Significantly, the ABA brought this suit as a facial challenge to the Commission's application of the Red Flags Rule to attorneys before the Commission had filed any enforcement actions against attorneys for violating the Rule.  In such a pre-enforcement case, the ABA must

---

[20]   The AAJ argues that the state regulation of attorneys "traditionally has included disciplinary rules designed to ensure that lawyers do not compromise the identity or confidentiality of their clients." AAJ Br. at 10; *see also* AAJ Br. at 11 n. 6 (stating that "some courts have promulgated their own rules regarding protecting the identity and privacy of an attorney's clients").  These arguments miss the point: the Red Flags Rule is not designed to protect the confidentiality of an actual client's personal information (as were the GLBA privacy provisions), but are intended to protect the *victim* of the identity theft who was never a real client to begin with.  None of the local court rule provisions cited by the AAJ would protect the victim in these situations.

[21]   For example, the AAJ relies, AAJ Br. at 5-6, upon the recent Supreme Court decision, *Wyeth v. Levine*, 129 S. Ct. 1187, 1194-95 and n.3 (2009) which dealt with whether federal drug labeling law preempted the plaintiff's state-law failure to warn claim.  The Court noted that the presumption against preemption is particularly appropriate where doing so would entirely bar a state-law cause of action.  *Id.*, 129 S. Ct. at 1195 n.3 (*citing Medtronic, Inc. v Lohr*, 518 U.S. 470, 485, 116 S. Ct. 2240, 2250 (1996)).  Here, in contrast, application of the Red Flags Rule in no way precludes application of state bar rules.

show that no set of circumstances exist in which the Rule is valid against either a constitutional or statutory challenge. *Reno v. Flores*, 507 U.S. 292, 301, 113 S. Ct. 1439, 1446 (1993); *U.S. v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987).

If the plaintiff's motion is granted, regardless of the circumstances of the billing arrangement or the egregiousness of the consequences of identity theft, there would be no obligation on attorneys or law firms to institute a Red Flags program in order to detect, prevent, and mitigate the risks of identity theft.  Identity theft imposes a serious cost on consumers, businesses, and society at large.  Simple procedures implemented through the program – such as requiring a new client to show a government-issued picture identification card –  would prevent problems that can arise when an attorney does not validate the identity of his client and does not require immediate payment for the legal services.  Subjecting attorneys who defer payment to the Red Flags Rule would prevent situations such as, for example, that in which the attorney bills an innocent victim for legal services provided to an imposter, unwittingly prepares property conveyance documents in the name of the victim that transfers property without the victim's authorization, or represents in a criminal proceeding an imposter who used another's identity when arrested, a situation which could lead to a criminal record in the name of the victim.

These examples are not merely abstract hypotheticals.  A law journal article recently reported several cases where imposters forged signatures on mortgage documents for properties that subsequently went into foreclosure.  In these cases, the victims in fact did not sign over the properties and subsequently filed grievance complaints against the lawyers. *See The Connecticut Law Tribune* (Sept. 18, 2009) (available at <u>www.law.com/jsp/law/sfb/ lawArticleFriendlySFB.jsp?id=12024338882687)</u> (describing two such incidences and noting that

evidence of identity theft in legal services "is easy to find."). The article reported that the attorneys did not ask for photo IDs or otherwise verify the identity of the purported client. The potentially serious problems that can result when attorneys who defer their payments do not validate the identity of their clients could easily have been rectified if the attorneys had implemented even a simple program under the Red Flags Rule.

Even apart from adversely affecting the protection of victims from identity theft, the ABA's position would also have even more anomalous and broader effects. Indeed, the ABA's argument that attorneys are not subject to the Red Flags Rule due to the lack of a plain congressional statement would logically mean that they would not be subject as "creditors" to the ECOA as well. Under that reasoning, all attorneys would be permitted to discriminate in "any aspect of a credit transaction," 15 U.S.C. § 1691(a), based on any of the prohibited factors, such as race, religion or gender. For example, an attorney would be permitted to allow Asian men to pay their legal bills six months after the legal services had been provided, but require earlier payments from Hispanic women, or refuse to provide services at all. Congress could not have intended such a result. Thus, subjecting attorneys who defer payment of their legal bills as "creditors" to the protection of the Red Flags Rule is consistent with the broad anti-discrimination purposes behind the ECOA, intended to eradicate discrimination in all credit-related situations.

Attorneys and law firms are free to assert in an actual enforcement case that their particular billing arrangements make the Red Flags Rule inapplicable in that case. However, the ABA cannot satisfy its burden of showing in this facial challenge that there can never be any situation where an attorney is a "creditor" under the law.

F.  <u>The compliance burden on attorneys is minimal and will protect the attorney</u>

The Red Flags Rule seeks to prevent identity theft by ensuring that a business that is deemed to be a "creditor"or "financial institution" under the Rule is on the lookout for the signs that an imposter is using someone else's personal information to obtain goods or services with no intention of paying.  For attorneys, this means instituting a program to identify and detect warning signs that an imposter is using the personal information of someone else to obtain legal services.  The agencies designed a rule that was risk-based because they recognized the potential burden that the rule could impose on creditors that are only subject to a small risk of identity theft.  *See* 72 Fed. Reg. at 63,741.  Thus, the Rule allows covered entities to structure their programs in ways that are commensurate with their risk so that high-risk entities implement more comprehensive programs, while low risk entities may implement less complete programs.

The written Identity Theft Program for low-risk legal practice areas would be minimal and could consist, for example, of simply checking government-issued photo ID cards when legal services are being sought.  Further, the attorney would need to have certain limited procedures in place in case he is notified – for example, from the victim or a law enforcement agency – that the consumer's identity has been misused, such as not attempting to collect debt from the true consumer or not reporting the debt on the consumer's credit report.  Finally, any minimal compliance burden on the attorney is more than offset by the protections afforded to the victim, as well as to the attorney who might otherwise face disciplinary proceedings for inadequately validating the identity of his client.

In sum, the Commission's application of its Red Flags Rule to lawyers, in appropriate circumstances, is not only mandated by Congress but will afford protections from real consumer

dangers, without imposing unwarranted burdens on lawyers.  This Court should reject the ABA's attempt to force a blanket exemption from the Rule.

## CONCLUSION

For the foregoing reasons, defendant Federal Trade Commission respectfully requests that the Court denies the plaintiff's motion for partial summary judgment pursuant to Fed. R. Civ. P. 56.

Respectfully submitted,

WILLARD K. TOM
General Counsel

JOHN F. DALY
Deputy General Counsel for Litigation

/s/ Michael D. Bergman
MICHAEL D. BERGMAN
(D.C. Bar No. 437994)
Attorney
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, D.C.  20580
(202) 326-3184
Fax: (202) 326-2477
mbergman@ftc.gov

Dated: October 13, 2009

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2009, a true and correct copy of the foregoing

Defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for

Summary Judgment was served upon the following via the Court's electronic case filing system:

James F. Segroves

PROSKAUER ROSE LLP

1001 Pennsylvania Avenue, NW

Suite 400 South

Washington, DC 20004-2533

jsegroves@proskauer.com

Steven C. Krane

PROSKAUER ROSE LLP

1585 Broadway

New York, NY 10036-8299

skrane@proskauer.com

R. Thomas Howell, Jr.

Patricia J. Larson

AMERICAN BAR ASSOCIATION

321 N. Clark Street

Chicago, IL 60654

John Vail

CENTER FOR CONSTITUTIONAL LITIGATION, P.C.

777 Sixth Street, N.W., Suite 520

Washington, D.C. 20001

john.vail@cclfirm.com

I hereby certify that on October 13, 2009, true and correct copies of the foregoing

Defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for

Summary Judgment were served  upon the following, by first class U.S. mail, postage prepaid, in

accordance with Fed. R. Civ. P. 5(b) and Local Civil Rule 5.4(d):

     Kristen J. Mathews

     David A. Lewis

     Rebecca L. Ambrose

     PROSKAUER ROSE LLP

     1585 Broadway

     New York, NY 10036-8299

                           /s/ Michael D. Bergman

                           MICHAEL D. BERGMAN

                           Attorney

                           Federal Trade Commission

                           600 Pennsylvania Ave., N.W.

                           Room 582

                           Washington, D.C. 20580

                           (202) 326-3184