## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

AMERICAN BAR ASSOCIATION,      )

                )

        Plaintiff,      )

                )

      v.           )      Civil Action No. 09-1636 (RBW)

                )

FEDERAL TRADE COMMISSION,     )

                )

        Defendant.     )

_____)

## MEMORANDUM OPINION

On August 27, 2009, the plaintiff, the American Bar Association, filed a three-count complaint against the Federal Trade Commission (the "Commission"), alleging that the Commission's application of Final Rule, Identity Theft Red Flags and Address Discrepancies Under the Fair and Accurate Credit Transactions Act of 2003, 72 Fed. Reg. 63,718 (Nov. 9, 2007) (the "Red Flags Rule" or the "Rule"), to attorneys exceeds the Commission's statutory authority under the Fair and Accurate Credit Transactions Act of 2003 ("the FACT Act"), see Pub. L. No. 108-159, 117 Stat. 1952 (codified at 15 U.S.C. §§ 1681-1681x (2006); 20 U.S.C. §§ 9701-8 (2006)), and therefore the Commission's actions in implementing the Red Flags Rule violates the Administrative Procedure Act, 5 U.S.C. §§ 702-706 (2006) ("APA"), see Complaint for Declaratory and Injunctive Relief ("Compl."). Specifically, the plaintiff alleges that the Commission's application of the Red Flags Rule to attorneys violates 5 U.S.C. § 706(2)(C), as it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," Compl. ¶¶ 54-60 (Count I), and 5 U.S.C. § 706(2)(A), and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," id. ¶¶ 61-64 (Count II), entitling the plaintiff to a

declaratory judgment under 28 U.S.C. § 2201 (2006), id. ¶¶ 65-67 (Count III).  On

September 23, 2009, the plaintiff filed a motion for partial summary judgment in this case

on Count I of its three-count complaint, Plaintiff's Motion for Partial Summary Judgment

("Pl.'s Mot.") at 1, which the defendant opposes,[1] Defendant's Memorandum of Points

and Authorities in Opposition to Plaintiff's Motion for Partial Summary Judgment

("Def.'s Opp'n").

The parties came before the Court on October 29, 2009, for a hearing on the

plaintiff's motion for partial summary judgment.  Upon consideration of the parties'

written submissions, the applicable legal authority, the oral arguments presented by the

parties, and for the reasons set forth below, the Court held that the plaintiff's motion for

summary judgment on Count I of its complaint must be granted.  This opinion is being

issued to supplement the Court's oral ruling.

## II.  BACKGROUND

A review of the relevant statutory and regulatory history underlying this action is

the first step necessary to understanding the nature of this controversy.

### A.    The Equal Credit Opportunity Act

The first congressional enactment pertinent to this matter is the Equal Credit

Opportunity Act, 15 U.S.C. § 1691 (2006) ("ECO Act").  The ECO Act was passed by

Congress in 1974 to eliminate discrimination by creditors against credit applicants on the

basis of sex or marital status with respect to all aspects of credit transactions, Pub. L. No.

---

[1]       The Court also considered the following documents in ruling on the motion: Memorandum of
Points and Authorities in Support of Plaintiff's Motion for Partial Summary Judgment ("Pl.'s Mem.");
Plaintiff's Statement of Material Facts not in Dispute; Reply Memorandum of Points and Authorities in
Support of Plaintiff's Motion for Partial Summary Judgment; and Brief Amicus Curiae of The American
Association for Justice in Support of Plaintiff's Motion for Partial Summary Judgment.

93-495, § 502, 88 Stat. 1500, 1521 (1974) (codified as Note, Congressional Findings and Statement of Purpose, 15 U.S.C. § 1691).  The ECO Act defines "creditor" as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit."  15 U.S.C. § 1691a(e).  Therefore, implicitly significant to the definition of creditor is the term "credit," and the ECO Act defines "credit" as "the <u>right</u> granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor."  15 U.S.C. § 1691a(d) (emphasis added).[2]

**B.      Fair and Accurate Credit Transactions Act of 2003**

In 2003, Congress passed the FACT Act, which incorporated by reference the definitions of "creditor" and "credit" found in the ECO Act, <u>see</u> 15 U.S.C. § 1681a(r)(5). The aim of the FACT Act is "to prevent identity theft, improve resolution of consumer disputes, improve the accuracy of consumer records, make improvements in the use of, and consumer access to, credit information."  H.R. Rep. No. 108-396, at 65-66 (2003) (Conf. Rep.), <u>reprinted in</u> 2003 U.S.C.C.A.N. 1753-54.  In furthering Congress's expressed aim, the FACT Act provides, in pertinent part, that agencies, including the Commission, shall:

> (A) establish and maintain guidelines for use by each financial institution and each creditor regarding identity theft with respect to account holders at, or customers of, such entities, and update such guidelines as often as necessary;

---

[2]      These definitions have remained unchanged since the ECO Act's enactment in 1974.  <u>See</u> Pub. L. No. 93-495, § 503, 88 Stat. at 1522.

> (B) prescribe regulations requiring each financial institution
> and each creditor to establish reasonable policies and
> procedures for implementing the guidelines established
> pursuant to subparagraph (A), to identify possible risks to
> account holders or customers or to the safety and soundness
> of the institution or customers . . . .

15 U.S.C. § 1681m(e)(1)(A)-(B).  Congress granted agencies the authority to enforce

their administrative rules and regulations adopted to advance the objectives of the FACT

Act through injunctive relief and the imposition of civil monetary penalties on violators.

See 15 U.S.C. § 1681m(h)(8)(B) (incorporating enforcement scheme established by 15

U.S.C. § 1681s).

### 1.      The Commission's Rulemaking: The Red Flags Rule

Pursuant to the congressional grant of authority provided in the FACT Act, on

July 18, 2006, the Commission, along with several other agencies (including the

Department of the Treasury's Office of the Comptroller of the Currency and Office of

Thrift Supervision, the Board of Governors of the Federal Reserve System, the Federal

Deposit Insurance Corporation, and the National Credit Union Administration) took the

first step in the administrative rulemaking process by publishing in the Federal Register a

joint notice of proposed rulemaking to implement sections of the FACT Act.  See Identity

Theft Red Flags and Address Discrepancies Under Fair Accurate Credit Transactions Act

of 2003, Proposed Rule, 71 Fed. Reg. 40,786 (July 18, 2006) ("Proposed Red Flags

Rule").  As the FACT Act directed, the Proposed Red Flags Rule indicated that "[t]he

Agencies . . . [were] proposing joint regulations requiring each financial institution and

creditor to establish reasonable policies and procedures for implementing the guidelines,

including a provision requiring credit and debit card issuers to assess the validity of a

request for a change of address under certain circumstances."   Id. at 40,786.

On November 9, 2007, after the period for notice and comment expired, the
agencies issued their final rule.  See the Red Flags Rule.  According to the Commission,
the following obligations are imposed on creditors and financial institutions by the Red
Flags Rule:

> Each creditor or financial institution "must periodically
> determine whether it offers or maintains covered accounts
> . . ."  16 C.F.R. § 681.1(c). If it does, the covered entity
> must develop and implement a written identity theft
> prevention program to identify, detect and respond to
> possible risks of identity theft applicable to them. 16 C.F.R.
> § 681.1(d). The program would need to specify measures
> implemented to prevent identity theft, for example by
> checking a government-issued picture ID card for new
> accounts or customers. The program would also need to
> indicate how the entity will respond if a red flag has been
> detected so as to mitigate the risks of ID theft, such as not
> billing the client or consumer whose identity was
> compromised, ensuring that information relating to the
> identity thief is not commingled with that of the victim, or
> reporting incidents of identity theft to law enforcement
> agencies. The covered entity needs to update its program
> periodically to guard against current ID theft risks, and
> provide for the continued administration of the program. 16
> C.F.R. § 681.1(e).

Def.'s Opp'n at 9.

It is important to note that no statement indicating that the Rule would be
applicable to the legal profession accompanied either the Proposed Red Flags Rule or its
final version, or was included in the comments accompanying the rulemaking.  Indeed,
with respect to the definition of credit and creditor, the Rule reiterated that the
Commission was adopting by reference the definitions of these terms as set forth in the
ECO Act, 15 U.S.C. § 1681a(r)(5), see 72 Fed. Reg. at 63,722, and added that creditors
subject to the regulations "include[d] lenders such as banks, finance companies,

automobile dealers, mortgage brokers, utility companies, and telecommunications companies," 16 C.F.R. § 681.1(b)(5).

Similarly, with respect to the "covered account[s]" governed by the Red Flags Rule, the agencies stated that the following types of accounts were covered:

> [a]n account that a financial institution or creditor offers or maintains, primarily for personal, family, or household purposes, that involves or is designed to permit multiple payments or transactions, such as a credit card account, mortgage loan, automobile loan, margin account, cell phone account, utility account, checking account, or savings account.

16 C.F.R. § 681.1(b)(3)(i).  However, the Rule also provided that a "covered account" could include "[a]ny other account that the financial institution or creditor offers or maintains for which there is a reasonably foreseeable risk to customers or to the safety and soundness of the financial institution or creditor from identity theft, including financial, operational, compliance, reputation, or litigation risks."  16 C.F.R. § 681.1(b)(3)(ii).

## 2.    Delays in Implementation of the Red Flags Rule

The Red Flags Rule was scheduled to take effect on January 1, 2008, with a "mandatory compliance" date of November 1, 2008.  72 Fed. Reg. at 63,718.  However, on October 22, 2008, the Commission issued a press release indicating that it would institute a six-month delay in the enforcement of the Rule until May 1, 2009, see Press Release, FTC Will Grant Six-Month Delay of Enforcement of 'Red Flags' Rule Requiring Creditors and Financial Institutions to Have Identity Theft Prevention Programs (Oct. 22, 2008),[3] due to what the Commission perceived as confusion by

---

[3]     Available at http://www.ftc.gov/opa/2008/10/redflags.shtm (last visited Sept. 23, 2009).

entities as to whether they were subject to the Rule.  The Commission stated that despite its outreach efforts, many entities and industries that the Commission viewed as being covered by the Final Red Flags Rule "were [still] uncertain about their coverage under the Rule" and therefore needed additional time to comply with the Rule.  Id.  The Commission reiterated in its October 22, 2008 press release that the ECO Act's definition of creditors would govern and added the following statement for clarification: "Some examples of creditors are finance companies, automobile dealers, mortgage brokers, utility companies, telecommunications companies, and non-profit and government entities that defer payment for goods or services."  Id.  Again, the Commission made no mention of attorneys.

For a second time enforcement of the Red Flags Rule did not go forward as planned because on April 30, 2009, the Commission issued a second press release postponing the May 1, 2009 enforcement date until August 1, 2009, again due to what the Commission perceived as confusion by entities as to whether they were creditors for purposes of the Rule.  See Press Release, FTC Will Grant Three-Month Delay of Enforcement of 'Red Flags' Rule Requiring Creditors and Financial Institutions to Adopt Identity Theft Prevention Programs (Apr. 30, 2009).[4]  And, in an attempt to again clarify what entities were subject to the Rule, along with its April 30, 2009 press release, the Commission issued a document entitled "FTC Extended Enforcement Policy: Identity Theft Red Flags Rule, 16 CFR 681.1" (April 30, 2009) ("Extended Enforcement

---

[4]     Available at http://www.ftc.gov/opa/2009/04/redflagsrule.shtm (last visited Sept. 23, 2009).

Policy").[5]  It was in this document that the Commission indicated for the first time that attorneys and other professionals "who bill their clients after services are rendered" are subject to the Final Red Flags Rule.  Id. at 1 n.3.  Specifically, the Commission stated:

> In [the FACT Act], Congress imported the definition of creditor from the [ECO Act] for purposes of the Fair Credit Reporting Act.  This definition covers all entities that regularly permit deferred payments for goods or services.  The definition thus has a broad scope and may include entities that have not in the past considered themselves to be creditors.  For example, creditors under the ECO[ Act] include professionals, such as lawyers or health care providers, who bill their clients after services are rendered.  Similarly, a retailer or service provider that, on a regular basis, allows its customers to make purchases or obtain services and then bills them for payment at the end of each month would be a creditor under the ECO[ Act].

Id. (emphasis added).

But again, the Rule was not implemented as planned, and on July 29, 2009, the Commission issued a third press release delaying enforcement of the Red Flags Rule from August 1, 2009, until November 1, 2009, based on its continued assessment that many entities, particularly small businesses, were still unsure whether they were subject to the Rule and thus needed additional time to bring their practices into compliance.  See Press Release, FTC Announces Expanded Business Education Campaign on 'Red Flags' Rule (July 29, 2009).[6]  The press release referenced a document created by the Commission that provided answers to frequently asked questions which confirmed its

---

[5]      Available at http://www.ftc.gov/os/2009/04/P095406redflagsextendedenforcement.pdf (last visited Sept. 23, 2009) (the "Extended Enforcement Policy").  The Commission subsequently revised the Extended Enforcement Policy on July 29, 2009.  See Fed. Trade Comm'n, FTC Extended Enforcement Policy: Identity Theft Red Flags Rule, 16 CFR 681.1 at 1 n.2 (July 29, 2009).  For all purposes of this action, the subsequent revision merely reiterated the rationale for the Commission's position.

[6]      Available at http://www.ftc.gov/opa/2009/07/redflag.shtm (last visited Sept. 23, 2009).

position, first articulated in its April 30, 2009 Extended Enforcement Policy, that

attorneys engaged in the practice of law are required to comply with the Red Flags Rule

when their billing arrangements qualify them as creditors under the FACT Act and the

ECO Act.  Id.  According to the Commission's Frequently Asked Questions Web site:

> Under the [Red Flags] Rule, the definition of "creditor" is
> broad, and includes businesses or organizations that
> regularly provide goods or services first and allow
> customers to pay later. . . . Examples of groups that may
> fall within this definition are utilities, health care providers,
> lawyers, accountants, and other professionals, and
> telecommunications companies.

FTC, The Red Flags Rule: Frequently Asked Questions ¶ B.1 (footnote omitted).[7]

The plaintiff represented at the hearing on the motion that it attempted to

informally meet with the Commission to discuss the Commission's interpretation of the

FACT Act and application of the Red Flags Rule to attorneys, but no fruitful discussion

occurred as a result of its attempts, and therefore on August 27, 2009, the plaintiff's filed

this action.

## II.  STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary

judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of

law."  When ruling on a motion for summary judgment, the Court must view the evidence

in the light most favorable to the non-moving party.  Holcomb v. Powell, 433 F.3d 889,

---

[7]     Available at http://www.ftc.gov/bcp/edu/microsites/redflagsrule/faqs.shtm (last visited
Sept. 23, 2009).

895 (D.C. Cir. 2006).  The Court must also draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  However, the non-moving party cannot rely on "mere allegations or denials," <u>Burke v. Gould</u>, 286 F.3d 513, 517 (D.C. Cir. 2002), because "conclusory allegations unsupported by factual data will not create a triable issue of fact," <u>Pub. Citizen Health Research Group v. FDA</u>, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal citation and quotation marks omitted).  If the Court concludes that "the non-moving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then the moving party is entitled to summary judgment.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

Count I of the plaintiff's complaint seeks to have the Commission's application of the Red Flags Rule to attorneys deemed a violation of 5 U.S.C. § 706(2)(C) on the basis that the Commission's action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  Compl. ¶¶ 54-60.  The plaintiff relies primarily upon the District of Columbia Circuit Court's decision in <u>American Bar Ass'n v. Federal Trade Commission</u>, 430 F.3d 457 (D.C. Cir. 2005), in which the Circuit Court found that that the Commission's interpretation of the term "financial institution" in the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801, to include attorneys was impermissible.  Specifically, the Circuit held that Congress did not "by any remaining ambiguity, intend[] to undertake the regulation of the profession of law – a profession never before regulated by 'federal functional regulators' – and never mentioned in the statute," <u>id.</u> at 469.

In determining whether an administrative agency has acted in a manner adverse to

5 U.S.C. § 706(2)(C), the Court must give deference to any agency regulatory

interpretation when deference is warranted.  The level of deference that must be

accorded, if any, varies depending on the manner in which the agency has acted or what

source of authority the agency has interpreted.  For example, an agency's interpretation is

"entitled to respect" to the extent that it holds the "power to persuade" if the agency is

acting without implicit or explicit congressional authorization.  Skidmore v. Swift & Co.,

323 U.S. 134, 140 (1944) (stating that in determining whether the agency's position is

compelling where the agency is not acting with congressional authority, the court should

consider "the thoroughness evident in its consideration, the validity of [the agency's]

reasoning, [and] its consistency with earlier and later pronouncements"), cited in

Gonzales v. Oregon, 546 U.S. 243, 268 (2006).  One of the key factors is whether the

agency has articulated a reasonable rationale for its decision.  Tripoli Rocketry Ass'n, Inc.

v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 437 F.3d 75, 77 (D.C. Cir. 2006)

("'Not only must an agency's decreed result be within the scope of its lawful authority,

but the process by which it reaches that result must be logical and rational [or no

deference is warranted].'" (quoting Allentown Mack Sales & Serv., Inc. v. NLRB, 522

U.S. 359, 374 (1998))).  On the other hand, an agency's interpretation of its own

ambiguous regulation promulgated pursuant to a congressional grant of authority is

"controlling unless plainly erroneous or inconsistent with the regulation."  Auer v.

Robbins, 519 U.S. 452, 461 (1997) (citations and internal quotations omitted).  But in

determining whether any degree of deference should be accorded to agency action, the

Court must first determine whether Congress has delegated authority to the agency to act

either in accordance with an express congressional objective or to fill in any regulatory gaps left unaddressed by Congress.  That determination is guided by the now familiar test set forth in <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984).[8]  Under <u>Chevron</u>, the Court must first determine "whether Congress has directly spoken to the precise question at issue[, and i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  <u>Id.</u> at 842-43.  If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  <u>Id.</u> at 843.

---

[8]      It is worth noting that the Commission contends that the plaintiff's first count of its complaint being a facial challenge to its regulation, the Court, to invalidate the Red Flags Rule, must find that the Rule cannot be applied to attorneys under any circumstance.  See Def.'s Opp'n at 35.  The Court finds that it need not go so far to side with the plaintiff.  As the Circuit has stated:

> The Supreme Court has never adopted a 'no set of circumstances' test to assess the validity of a regulation challenged as facially incompatible with governing statutory law.  Indeed, the Court in at least one case, <u>Sullivan v. Zebley</u>, 493 U.S. 521 . . . (1990), upheld a facial challenge under normal <u>Chevron</u> standards, despite the existence of clearly valid applications of the regulation.

<u>Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs</u>, 145 F.3d 1399, 1407-1408 (D.C. Cir. 1998); <u>see also</u> <u>Mineral Policy Ctr. v. Norton</u>, 292 F. Supp. 2d 30, 38-40 (D.D.C. 2003) ("Thus, based upon the uneven application of the no-set-of-circumstances test [set forth in <u>United States v. Salerno</u>, 481 U.S. 739 (1987)], the confusion surrounding the doctrine, and this court's own view that <u>Chevron</u> is adequately deferential to the decisions of administrative agencies, the court declines to rely upon <u>Salerno</u> here.").  <u>But see</u> <u>Amfac Resorts, L.L.C. v. U.S. Dep't of Interior</u>, 282 F.3d 818, 827 (D.C. Cir. 2002) (noting that the Circuit's application of <u>Chevron</u> in <u>Nat'l Mining Ass'n</u> may not have been appropriate, but as of yet it has been a "question unnecessary for [the Circuit] to answer"), <u>rev'd on other grounds</u>, <u>sub nom. Nat'l Park Hospitality Ass'n v. Dep't of Interior</u>, 538 U.S. 803 (2003).
     Indeed, attorneys as a whole should not be left to wonder about the applicability of the Red Flags Rule and the potentially of resulting civil monetary liability for non-compliance.  The problem, as explained below, is that no attorney could know whether the Rule will apply to that attorney's billing practices under the Commission's interpretation, given the fact that clients' ability to make immediate payments will always be a factor, an intangible over which an attorney has no control.  Further, an attorney compelled to represent a client by a tribunal who is obliged to pay the attorney all or part of the attorney's services, would not be able to terminate the relationship simply because the attorney feared that the client might not make immediate payments, subjecting the attorney to potential liability under the Rule for reasons totally beyond the attorney's control.

In applying this two-step analysis, the Supreme Court in <u>Chevron</u> recognized that "'[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.'" <u>Id.</u> (quoting <u>Morton v. Ruiz</u>, 415 U.S. 199, 231 (1974)).  However, it also put the judiciary in the position of being "the final authority on issues of statutory construction," instructing courts to "reject administrative constructions which are contrary to clear congressional intent." <u>Id.</u> at 843 n.9.  Indeed, "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." <u>Id.</u>

The <u>Chevron</u> doctrine also recognizes that a congressional grant of authority can be implicit or explicit, and like the deference given to agencies to interpret their own regulations, it commands that if courts reach the second <u>Chevron</u> question, they must give "considerable weight . . . to an executive department's construction of a statutory scheme it is entrusted to administer[.]" <u>Id.</u> at 844 ("[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.").  The obligation to accord deference to administrative interpretations is important because an agency is in the best position, often based on its "knowledge respecting the matters subjected to agency regulations," to make "decision[s] as to the meaning or reach of a statute" and "reconcile[e] conflicting policies" that may have developed.  <u>Id.</u> (internal quotation omitted).  Thus, if the agency's "choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [a court] should not disturb it unless it appears from the statute or its

legislative history that the accommodation is not one that Congress would have sanctioned." Id. at 845.  However, not just any ambiguity in a congressional statute will do, as "the existence of ambiguity is not enough per se to warrant deference to the agency's interpretation.  The ambiguity must be such as to make it appear that Congress either explicitly or implicitly delegated authority to cure that ambiguity." Am. Bar Ass'n v. F.T.C., 430 F.3d at 469.

### III.  LEGAL ANALYSIS

In answering the first question of Chevron, the logical place to start is with the ECO Act and the FACT Act, and "[t]he starting point in [construing] . . . the meaning of [these] statute[s] is the language of the statute[s] [themselves]." Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 210 (1979).  Even a cursory review of the language of these Acts and the purposes underlying their enactment leads the Court to the conclusion that it was not "the unambiguously expressed intent of Congress," Chevron, 467 U.S. at 842-43, to bring attorneys within the purview of the FACT Act and thus subject them to regulation by the Commission's Red Flags Rule.  Plainly, neither the FACT Act nor the ECO Act contains an "unmistakably clear" grant of statutory authority allowing the Commission's venture into the regulation of the practice of law. Am. Bar Ass'n v. F.T.C., 430 F.3d at 471-72 (citation and internal quotations omitted).  Even if it could be said that Congress left some ambiguity as to whether attorneys were to be regulated by not explicitly extracting attorneys from the definition of creditors, that lack of clarity in the statute cannot reasonably be interpreted as either an explicit or implicit grant to the Commission to "cure th[e] ambiguity" by regulating attorneys, given that the regulation of the legal profession has been left to the prerogative of the states. Id. at 467,

469, 471-72 ("[I]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." (internal quotations omitted) (quoting Will v. Mich. Dep't of State Police, 491 U.S. 58, 65, (1989))).  But, for the sake of argument, even if the Court were to reach question two of Chevron by finding that the FACT Act did not foreclose the Commission's regulation of attorneys, it would still find that the Commission's interpretation of the FACT Act and its resulting application of the Red Flags Rule to attorneys is unreasonable and therefore undeserving of deference. Accordingly, under either analysis, the Court must grant the plaintiff's motion for partial summary judgment on Count I of its complaint because the Red Flag Rule cannot be lawfully extended to reach attorneys.

> **A.    Whether Congress Granted the Commission the Authority to Regulate Attorneys As Creditors Under the FACT Act**

> 1.    The Language and Purpose of the FACT Act Does Not Extend to the Regulation of Attorneys

Words take meaning from their ordinary usage, any statutorily defined meaning, and "the natural reading of the word within the context of [a statute]."  Carcieri v. Salazar, __ U.S. __, __, 129 S. Ct. 1058, 1064 (2009).  Context and assigned definitions are relevant because courts "are obliged to give effect, if possible, to every word Congress used."  Id. at 1066 (citation and quotations omitted).  Therefore, if Congress used a term, the term means what it ordinarily means, unless it is prescribed a different statutory meaning, and how that term is used in the context of the statute further indicates its intended meaning.

Applying these principles to this case, a number of conclusions become self-evident.  First, the context is inconsistent with the regulation of attorneys.  The FACT Act, the act that authorizes the Commission to implement regulations to protect against identity theft, speaks in terms of "financial institution[s] and . . . creditor[s]," and "theft with respect to <u>account holders</u> at, or <u>customers</u> of, such entities."  15 U.S.C. § 1681m(e)(1)(A)-(B) (emphasis added).  The selection of "financial institution" along with "creditor" as the targets of the legislation implies that the FACT Act was created to apply to entities involved in banking, lending, or financial related business.  Further underscoring this conclusion is the fact that the ECO Act, from which the definition of "creditor" was derived, was a statute promulgated to protect credit applicants from specified forms of discrimination.  <u>See</u> 15 U.S.C. § 1691.  Therefore, at least with respect to the provisions at issue in this case (and even as the name of the Act itself implies: The Fair and Accurate <u>Credit Transactions</u> Act), it cannot be that the Act was created as a means of eliminating all types of identity theft, but rather to eliminate a specific kind of identity theft: identity theft in the credit industry.

Second, the targeted population the FACT Act identifies does not correlate with the regulation of attorneys.  The targeted population speaks of account holders and customers, and the ECO Act, which focuses on credit applicants and appraisal reports, do not aim their reach expressly to the legal profession.  Nor do the terms used to identify the targeted population correspond to the terms used in the legal profession context.  Credit applications, appraisal reports, account holders and customers are all concepts foreign to the practice of law, not squarely falling within the universe of terms used to describe participants in the legal profession or the types of activities conducted by

attorneys, nor the types of relationships attorneys have with their clients.  An example

described in the FACT Act itself underscores this point.  Congress instructed the

Commission to

> consider including reasonable guidelines providing that
> when a <u>transaction occurs with respect to a credit or deposit
> account</u> that has been inactive for more than 2 years, the
> creditor or financial institution shall follow reasonable
> policies and procedures that provide for notice to be given
> to a consumer in a manner reasonably designed to reduce
> the likelihood of identity theft with respect to such account.

15 U.S.C. § 1681m(e)(2)(B) (emphasis added).  To start, this example presupposes a pre-

existing credit relationship.  Attorneys are not known for maintaining credit or debit

accounts on behalf of their clients.  Moreover, attorneys provide services to <u>clients</u>, and

do not engage in transactions with deposit account holders or consumers, and the Court is

aware of no source of authority insinuating that these terms are interchangeable with the

term "client," especially given special doctrines that shape the unique relationships

between lawyers and their clients, such as the age-old common law attorney-client

privilege doctrine.  <u>See, e.g.</u>, <u>Upjohn Co. v. U.S.</u>, 449 U.S. 383, 389 (1981) (remarking

that "[t]he attorney-client privilege[,] is the oldest of the privileges for confidential

communications known to the common law" (citing 8 J. Wigmore, Evidence § 2290

(McNaughton rev. 1961))).  This distinction is significant given the specially designed

codes of professional conduct to which attorneys must abide and the special fiduciary and

other responsibilities attorney must adhere to when interacting with clients.  The Court is

confident in concluding that the term attorney-client is nuanced enough that if Congress,

which is comprised of many members who are themselves attorneys, intended to regulate

attorneys and their invoiced billing practices it would have used the appropriate

terminology to denote that intent and not hidden it in a statute expressly targeted at the credit industry.  See Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001) ("[Congress] does not . . . hide elephants in mouseholes.").

Third, the definitions of the statutory language do not apply to attorneys.  The statute states that the term "creditor" applies to "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e).  Inherently important then to this definition is the term credit, which is defined to "mean[] the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor."  Id. § 1691a(d) (emphasis added).  Again, these definitions do not equate to concepts associated with the legal profession.  Nor did Congress make any contemporaneous findings in the ECO Act or the FACT Act, or the Commission itself in its Red Flags Rule rulemaking, that lawyers regularly extend the right to their clients to defer payments.

The Commission's assertion to the contrary that attorneys "regularly extend[], renew[], or continue[] credit . . . [or] regularly arrange[] for the extension, renewal, or continuation of credit" to their clients,  15 U.S.C. § 1691a(e) (emphasis added), and therefore should be governed by the regulations promulgated pursuant to the FACT Act is unsupported by either legislative or administrative findings.  Nonetheless, it is the Commission's position that the Rule's application to attorneys was obvious based on the text of the ECO Act, the FACT Act, and the Red Flags Rule.  Def.'s Opp'n at 15.  But that interpretation was certainly not obvious to the plaintiff, nor is it obvious to this

Court.  The Commission has not identified anything in the legislative history – not even a floor statement by one member of Congress – where the problem of identity theft in the legal profession was addressed, or in the rulemaking record process where even one attorney either commented on the Rule on behalf of the legal profession or questioned whether the Rule applied to attorneys.  See id. at 7 ("The agencies collectively received a total of 129 comments after a 60-day comment period. While certain commenters responding to the [joint notice of proposed rulemaking, including debt collectors and realtors, neither of whom were specifically mentioned in the regulation,] noted the potentially broad scope of the proposed 'creditor' definition, no attorneys or bar associations submitted comments regarding whether attorneys should or should not be covered as 'creditors' under the Act." (footnote omitted)).  Indeed, the Commission has identified nothing in the legislative or administrative record where either Congress or the Commission made any factual findings that there is a significant (or for that case any) problem of identity theft associated with the legal profession to warrant application of the Red Flags Rule to attorneys.  Therefore, neither the language nor the purpose for the enactment of the Rule or the legislative history of the FACT Act or the ECO Act gave attorneys any constructive notice either.  The Commission has attempted to offer some post hoc rationalization in its briefing that there has been incidents of identity theft associated with the legal profession, id. at 35-36 (representing that "evidence of identity theft in legal services 'is easy to find,'"), but not only is such post hoc rationalization not compelling for the purpose of providing justification for the Commission's interpretation, Fed. Power Comm'n v. Texaco, Inc., 417 U.S. 380, 397 (1974) ("[The Court] cannot 'accept appellate counsel's post hoc rationalizations for agency action'; for an agency's

order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.'" (citations omitted)), but it is also unconvincing, as it appears that the examples offered by the Commission may have stemmed more from a notary failing to exercise due diligence than any failings of attorneys that contributed to those incidents of purported identity theft, see Def.'s Opp'n at 35 (describing two incidents reported in a legal publication entitled The Connecticut Law Tribune that "imposters forged signatures on mortgage documents for properties that subsequently went into foreclosure").  And even with this last-minute effort to provide support for its decision, the Commission acknowledged at the motion's hearing and in its opposition to the plaintiff's motion, as it must, that the legal profession is at best a "low-risk" industry for identity theft.  Id. at 37.

2.      The Sources of Legal Authority Relied Upon by the Commission Do Not Support the Regulation of Attorneys Under the FACT Act

The sources of legal authority relied upon by the Commission to support its interpretation of the applicability of the Red Flags Rule to attorneys consist of case law and a 1985 interpretation of the ECO Act by the staff of the Federal Reserve Board.  As for the case law authority, the Commission relies upon cases from the Sixth Circuit, federal district courts in Ohio and Washington, and a federal bankruptcy court of Ohio, all which the Commission contends have construed the ECO Act consistent with its position.  Def.'s Opp'n at 16-17.  The first concern the Court has with the Commissions reliance on these cases is that some of them do not actually construe the ECO Act itself, but instead the provisions of the Federal Reserve Board's regulations implementing the ECO Act, commonly referred to as "Regulation B," see 40 Fed. Reg. 49,298 (Oct. 22, 1975) (codified as amended at 12 C.F.R. pt. 202).  See, e.g., Mays v. Buckeye Rural Elec. Coop., Inc., 277 F.3d 873, 878 (6th Cir. 2002); Barney v. Holzer Clinic, Ltd., 110 F.3d

1207, 1209 (6th Cir. 1997) (noting that the definition in Regulation B "differs slightly" from that in ECO Act); see also Williams v. AT & T Wireless Servs., Inc., 5 F. Supp. 2d 1142, 1144 (W.D. Wash. 1998) (relying in part on Regulation B's interpretation of what is a credit transaction).  The question in this case is not whether Regulation B was interpreted correctly in those cases, but what was Congress's intended applicability of the FACT Act.  While Regulation B may have some relevancy to the resolution of the issue before the Court, it is limited "to the extent [that it] shed[s] light on [the] meaning" Congress intended to import by its use of the terms "creditor" and "credit" in the ECO Act, and the FACT Act's subsequent adoption of those terms.  Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council, __ F.3d __, __, No. 08-2440, 2009 WL 3416164, at *11 (1st Cir. Oct. 26, 2009) ("[C]omplementary regulatory schemes" by other agencies are only relevant "to the extent they shed light on [a statute's] meaning."); accord Fed. Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 32 (1981) ("[T]he courts are the final authorities on issues of statutory construction. They must reject administrative constructions of the statute, whether reached by adjudication or by rule-making, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement."); cf. Envtl. Def. v. Duke Energy Corp., 549 U.S. 561, 576 (2007) (finding that an agency need not have interpreted a statutory term consistent with previous regulatory interpretations, so long as the agency's interpretation was ultimately reasonable).  And the second concern the Court has with the case authority relied on by the Commission is that none of the cases had as their backdrop the legal profession; rather, with the exception of Barney, the cases involve utility providers, Mays, 277 F.3d at 875; a cellular phone service provider, Williams, 5 F. Supp. 2d at

1144; and public and private gas suppliers, <u>Mick v. Level Propane Gases, Inc.</u>, 183 F.

Supp. 2d 1014, 1016 (S.D. Ohio 2000); <u>In re Brazil</u>, 21 B.R. 333, 334 (Bankr. N.D. Ohio

1982), all which logically fit the notion of the type of entities that provide services to

<u>customers</u> and <u>account holders</u>.[9]

The Commission also relies upon the absence in these cases of any industry-based

exception to the ECO Act.  Def.'s Opp'n at 17.  The Court agrees that there is no express

industry-based exception provided in either the ECO Act or the FACT Act, nor is there

any need for one for the reasons already explained – attorneys simply do not meet the

overly broad definition of creditors adopted by the Commission.

The Commission's reliance on the Federal Reserve Board's staff notes to

Regulation B is also not persuasive.  Def.'s Opp'n at 17-18.  The Federal Reserve Board

first issued Regulation B in 1975.  <u>See</u> 40 Fed. Reg. 49,298 (Oct. 22, 1975) (codified as

amended at 12 C.F.R. pt. 202).  In 1985, the Federal Reserve Board published its staff's

interpretations of Regulation B as a supplement to the Board's regulations, which

explained that "[g]ood-faith compliance with the commentary affords creditors protection

from civil liability."  50 Fed. Reg. 48,018, 48,024 (Nov. 20, 1985).  While Regulation B

adopted, as required, the definitions of credit and creditor contained in the ECO Act, the

staff interpretations were interpretations of <u>Regulation B</u>, not the ECO Act.  50 Fed. Reg.

---

[9]        The Court is not persuaded that the Commission's reliance on <u>Barney v. Holzer Clinic, Ltd.</u>, 110
F.3d 1207 (6th Cir. 1997), is sound given that the Sixth Circuit expressly refused to address the question of
whether a medical services provider was a creditor under ECO Act, <u>id.</u> at 1209 ("We need not address
either of these propositions, however, because plaintiffs are not 'applicants' under the ECO[ Act] and
therefore cannot invoke the Act's protections."), and made findings to the contrary, <u>id.</u> at 1211 ("The
provision of medical treatment under this program is not a credit transaction, either under the technical
language of the ECO[ Act] or in the more common sense of the term, any more than is a court-appointed
attorney's agreement to represent an indigent defendant.").

at 48,048 (codified at 12 C.F.R. pt. 202, App. D, ¶ 1).  In providing an example of its

application, the staff interpretation cited by the Commission reads:

> Examples.  If a service provider (such as a hospital, doctor,
> lawyer or retailer) allows the client or customer to defer the
> payment of a bill, this deferral of debt is credit for purposes
> of the ["incidental credit"] regulation, even though there is
> no finance charge and no agreement for payment in
> installments.  Because of the exceptions provided by this
> section, however, these particular credit extensions are
> excepted from compliance with certain procedural
> requirements as specified in the ["incidental credit"]
> regulation.

50 Fed. Reg. at 48,049 (emphases added) (codified at 12 C.F.R. pt. 202, Supp. I, § 202.3,

¶ 3(c)1 (2009)).  Therefore, it is the Commission's position that when Congress enacted

the FACT Act in 2003, it was aware of and thereby acquiesced to the Federal Reserve

Board's staff interpretation of Regulation B's "incidental credit" provision, and thus

attorneys should be brought within the definition of creditors.  See Def.'s Opp'n at 21-25.

     It is telling that the Commission has cited to nothing in the ECO Act's legislative

history to support its position, and for a court to "give weight to a contemporaneous

construction of a reenacted statute . . . there [must be an] indication [that] Congress

considered the interpretation."  Koszola v. F.D.I.C., 393 F.3d 1294, 1299 (D.C. Cir.

2005) (citation omitted); see also 2B Norman J. Singer & J.D. Shambie Singer,

Sutherland Statutes and Statutory Construction § 49:9 at 134-35 (7th ed. 2008)

(explaining that the congressional-acquiescence argument is inapplicable "where nothing

indicates that the legislature had its attention directed to the administrative interpretation

upon reenactment").  The Commission cites a Supreme Court case for the proposition

that "Congress is presumed to be aware of an administrative or judicial interpretation of a

statute and to adopt that interpretation when it re-enacts a statute without change."  Def.'s

Opp'n at 24 (citing Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 382 n.66 (1982) (citation omitted)).  The passage from Merrill Lynch cited by the Commission goes on to say, however, that "where . . . Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."  Merrill Lynch, 456 U.S. at 382 n.66  This situation is analogous to the one presented to the Court here.  When Congress enacted the FACT Act, it incorporated sections of a prior law, the ECO Act, and in doing so presumably knew how interpretations of the prior statute would affect the new statute.  However, the Supreme Court's presumption of knowledge rule is not applicable to the Federal Reserve Board's staff's interpretations in Regulation B because those interpretations were made in a context totally unrelated to identity theft, and therefore the Court is not convinced that it is proper to presume that Congress intended to adopt the Regulation B interpretations when it enacted the FACT Act.  Accordingly then, absent any legislative history showing that the Federal Reserve Board's staff's interpretation of Regulation B was actually considered by Congress when enacting the FACT Act, and given that the purposes of the FACT Act and Regulation B do not square with one another, the Court cannot draw the inference the Commission urges.

In affirming a district court's finding that a law firm and its members were not creditors under the ECO Act, see Riethman v. Berry, 113 F. Supp. 2d 765, 768-69 (E.D. Pa. 2000) (finding that the attorney defendants and their law firm were not "creditors" under the ECO Act because "it is insufficient to trigger [ECO Act] coverage to show that a debtor failed to pay a debt or that a creditor voluntarily chose to delay collection and

continue to perform work on behalf of the debtor. The key element which must be shown

is whether, under the agreement between the debtor and the creditor, the debtor has a

right to defer payment of existing debt or to incur future debt and defer payment at its

sole discretion."), the Third Circuit stated that "Regulation B presupposes an already

existing credit relationship between the parties," and was therefore inapplicable to the

situation before it, Riethman v. Berry, 287 F.3d 274, 279 (3d Cir. 2002).  Indeed,

although the Third Circuit did not go so far as to conclude that attorneys were "ipso

facto" exempt from the ECO Act, the Court found that "[u]nless the fee agreements

themselves are credit transactions, the failure of [a law firm] to collect after 'maturity'

cannot be an extension of credit.  [Therefore b]ecause the fee agreements [did] not

themselves extend credit, failure to enforce them was not the continuance of existing

credit."  Id.  Of particular significance to this case was the Third Circuit's observation that

the attorneys' "right to prompt and full payments" from their clients under "the express

terms of their fee agreements" was determinative, and "the fact that [the attorneys]

permitted their clients to pay by check or credit card, or provided legal services prior to

receiving a retainer, [did] not alone bring them within the ECO[ Act]."[10]  Id. at 278.

    This discussion leads to another point: even supposing that Regulation B has

relevance considering the purpose for the passing of the FACT Act, therefore requiring

that the Federal Reserve Board's staff interpretation be examined, this Court concludes

that it is not legally obliged to defer to the staff's interpretation that the term creditor

applies to attorneys.  First, while not necessarily adverse to the plaintiff's position, the

---

[10]    The Commission's advocacy for a case-by-case approach, Def.'s Opp'n at 20, would have attorneys
guessing as to whether they fall within the purview of the Red Flags Rule.  Attorneys should not be
exposed to a sea of uncertainty, especially one that hinges to a significant degree on whether a client is
capable of paying immediately upon the performance of the attorney's services.

staff interpretation does not actually define attorneys as creditors, and it merely conveys the idea that attorneys are capable of extending credit.  12 C.F.R. pt. 202, Supp. I, § 202.3, ¶ 3(c)1 ("If a service provider (such as a . . . lawyer . . . ) allows the client or customer to defer the payment of a bill, this deferral of debt is credit for purposes of the regulation . . . .").  Therefore, even under the staff's interpretation, merely because an entity or individual is capable of providing credit does not necessarily render it a creditor under the ECO Act.  Creditor status under the Act attaches only to a "person who <u>regularly</u> extends, renews, or continues credit; any person who <u>regularly</u> arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit."  15 U.S.C. § 1691a(e) (2006) (emphases added).  Second, the staff's interpretation extends the congressional mandate to "client[s]" as well as "customer[s]," an impermissible reach given that, as already explained, the terms are not synonymous.  12 C.F.R. pt. 202, Supp. I, § 202.3, ¶ 3(c)1.  It is also logically unsound for the Commission to extrapolate that attorneys are creditors subject to the FACT Act based on the Federal Reserve Board's staff assessment that when "a . . . lawyer . . . [who] allows the client . . . to defer the payment of a bill" that lawyer is providing "incidental credit," 12 C.F.R. pt. 202, Supp. I, § 202.3(c)(1) (Regulation B), and therefore attorneys can be required to comply with the Red Flags Rule if they provide what the Federal Reserve Board staff considered "incidental credit." Def.'s Opp'n at 24.  For the reasons just explained, this reading of the staff interpretation is inconsistent with the FACT Act, and moreover, Regulation B, the regulation the staff was interpreting, provides a good-faith exemption to its application.  To come to the conclusion it has reached, the Commission is essentially taking the position that the

period of time between when a service is provided to when a lawyer or law firm invoices

a client for the service and the invoice is paid, amounts to a period during which credit

was extended if there is any interval of time between the providing of the service and the

payment of the invoice.  Def.'s Opp'n at 18; Extended Enforcement Policy at 1 n.3.  This

is clearly not what was intended by Congress by its use of the term credit in the ECO Act

and its subsequent inclusion of the term in the FACT Act.  The ordinary meaning of

"defer" is to postpone or delay.  See Webster's Third New Int'l Dictionary 591 (1981); see

also Black's Law Dictionary 486 (9th ed. 2009).  As the Second Circuit has observed:

> [T]he proposition that '[e]very contract for labor, not paid
> for in advance, is necessarily a contract upon credit,
> because the labor, when once performed, cannot be
> recalled[, must be rejected].'  If this proposition were
> strictly applied . . . countless transactions in which
> compensation for services is not instantaneous would be
> characterized as credit transactions.  Such indiscriminate
> application of the ECO[ Act] is not appropriate.

Shaumyan v. Sidetex Co., 900 F.2d 16, 18-19 (2d Cir. 1990) (citation omitted).  And, in

the end, as instructive as it might be, one agency's interpretation of a congressional

statute is "not controlling" on another agency's interpretation of that same statute.  Am.

Mun. Power-Ohio v. E.P.A., 98 F.3d 1372, 1375 (D.C. Cir. 1996); cf. Brock v. L.R.

Willson & Sons, Inc., 773 F.2d 1377, 1383, n.7 (D.C. Cir. 1985) (declining to decide who

deserves deference when the Labor Secretary's interpretation of a Labor Department

regulation conflicts with that of the Occupational Safety and Health Review

Commission).

The Commission also relies upon two cases, Heintz v. Jenkins, 514 U.S. 291

(1995), and Goldfarb v. Virginia State Bar, 421 U.S. 773 (1975), for the position that

attorneys are creditors under the ECO Act.  Def.'s Opp'n at 28-30.  This reliance is

misplaced.  In <u>Heintz</u>, the Supreme Court considered whether 15 U.S.C. § 1692a(6),

which defines "debt collector" as "any person . . . who regularly collects or attempts to

collect, directly or indirectly, debts owed or due or asserted to be owed or due another,"

could lawfully be applied to an attorney.  514 U.S. at 294.  The Court found that the

statute was indeed intended to regulate attorneys, first because "[i]n ordinary English, a

lawyer who regularly tries to obtain payment of consumer debts through legal

proceedings is a lawyer who regularly 'attempts' to 'collect' those consumer debts," and

also because an earlier draft of the statute that contained language exempting "any

attorney-at-law collecting a debt as an attorney on behalf of and in the name of a client,"

which was omitted from the final version.  <u>Id.</u>  Neither of these factors is present here.

As the plaintiff correctly posits: "In 'ordinary English,' no one would assume that a

lawyer engaged in the practice of law is a 'creditor' simply because the lawyer bills clients

for services rendered and does not demand immediate payment."  Pl.'s Reply at 11.

Moreover, the legislative histories of the ECO Act and the FACT Act are devoid of any

indication that the statutes were intended to apply to attorneys.

     As for <u>Goldfarb</u>, there the Supreme Court considered whether it should find a

"learned professions" exemption to § 1 of the Sherman Act, 15 U.S.C. § 1, an act that

creates criminal and civil liability for "every person" who engages in any combination or

conspiracy to restrain "trade or commerce," given state regulation of the legal profession.

421 U.S. at 775, 788.  In rejecting the attorneys' argument that the practice of law was not

"trade or commerce," the Court looked to the purpose of the statute, finding that

"Congress intended to strike as broadly as it could in § 1 of the Sherman Act, and to read

into it so wide an exemption as that urged on us would be at odds with that purpose."  <u>Id.</u>

at 787.  "Whatever else it may be," the Court explained, "the examination of a land title is

a service; the exchange of such a service for money is 'commerce' in the most common

usage of that word."  Id. at 787-88.  While the Court will not challenge the Commission's

representations that Congress also intended the term credit to be broadly defined, Def.'s

Opp'n at 4 n.7, it is nevertheless a term that encompasses substantially less activity than

the term commerce.  And as broad as the term credit may be defined, it surely does not

have the reach that Congress intended by inclusion of the term commerce in the Sherman

Act.  Indeed, credit is a specific subset of activity that falls within the notion of

commerce, a subset which does not logically or commonly apply to attorney billing

practices.  Invoicing clients for services previously rendered, instead of demanding

immediate payment when service is provided is more likely an outgrowth of practicality

and necessity, rather than an attempt to provide clients credit.

Again, the "hallmark of 'credit' under the ECO[ Act] is the right of one party to

make deferred payment."  Riethman, 287 F.3d at 277 (emphasis added).  Simply because

a lawyer or law firm fails to demand payment immediately upon rendering a service does

not make the lawyer or law firm a creditor or amount to the granting of a "right" to defer

payment.  Id.; accord Lewis v. ACB Bus. Servs., Inc., 135 F.3d 389, 408 (6th Cir. 1998)

(holding that lawyer-defendant was not a "creditor" under the ECO Act simply because

he offered to settle preexisting claims against the debtor-plaintiff, explaining that,

"[o]therwise, an attorney would be a creditor under the ECO[ Act] anytime the attorney

offered to settle a case"); see also Mick's at Pennsylvania Ave., Inc. v. BOD, Inc., 389

F.3d 1284, 1289 (D.C. Cir. 2004) (finding that "there [was] no evidence that . . . [two]

restaurant business[es], 'regularly' extend[ed] or arrange[d] credit" so as to bring them

within the purview of the ECO Act); <u>Shaumyan</u>, 900 F.2d at 18 (finding that a home

improvement contract that provided for progress payments by homeowners was not a

"credit transaction" subject to the ECO Act because it did not grant the homeowners "a

<u>right</u> to defer payment for a monetary debt, property or services;" instead "it set forth a

payment schedule that obligated the [homeowners] to make incremental payments as the

work progressed[,] . . . [payments] substantially contemporaneous with [the contractor's]

performance under the contract" (emphasis added)).

 Given the plain-meaning and statutorily assigned definitions of the terms

interpreted by the Commission, the aim of the legislation, and the ill-adapted application

of these terms to the legal profession, it becomes clear that the intent of Congress is

unambiguous: it did not grant to the Commission the broad authority to exercise

regulatory control over attorneys pursuant to the FACT Act, and accordingly the Red

Flags Rule similarly cannot be properly promulgated in such a broad manner.  The

Commission was never charged with the authority to reconcile any conflicting policy or

gap in policy left by Congress, and thus its actions are entitled to deference only so far as

they have the "power to persuade." <u>Skidmore</u>, 323 U.S. at 140.  Therefore, without the

authority to act, and given the fact that attorneys do not easily fit within the framework of

who commonly are thought to be creditors, the Court cannot find the Commission's

position persuasive and therefore controlling.

 Having concluded that the Commission's application of the Red Flags Rule is not

entitled to deference under <u>Chevron</u> because it was not Congress's clear intent for the

Commission to regulate lawyers when it enacted the FACT Act, 467 U.S. at 843, the

Court's analysis could end here.  But to make it absolutely clear that the Commission has

acted beyond its authority, the Court will assume for the sake of argument that Congress' failure to specifically indicate whether lawyers qualify as creditors under the FACT Act raises sufficient ambiguity as to whether Congress intended that result.  And therefore, the Court will examine the second question of <u>Chevron</u>: whether the Commission's conclusion that attorneys can be subjected to complying with the Red Flags Rule is "a permissible construction of the statute."  <u>Id.</u>

### B.     Whether the Commission's Construction of the FACT Act is Permissible

For the reasons already stated, even if the Court were compelled to defer to the Commission's interpretation that attorneys could be regulated under the FACT Act based upon a congressional grant of authority to the Commission to regulate attorneys, the Commission's application of the Red Flags Rule to attorneys who invoice their clients is not reasonable, <u>Am. Bar Ass'n</u>, 430 F.3d at 471, and therefore not "entitled to respect" because it lacks the "power to persuade,"[11] <u>Skidmore</u>, 323 U.S. at 140.

As a prelude to its analysis of the second prong of <u>Chevron</u>, the Court notes that it is immaterial whether, as the Commission contends, the burden of compliance on attorneys will be de minimis because the practice of law is a "low-risk" industry.  Def.'s Opp'n at 37.  The issue is not the ease in which compliance can be achieved, but only whether the legal profession can be regulated in the manner the Commission seeks to do.

---

[11]     The Commission's interpretation of the Red Flags Rule, as set forth in the Extended Enforcement Policy, is not entitled to any heightened deference other than to the degree provided in <u>Skidmore</u>, 323 U.S. at 140, because "the underlying regulation[, the Rule,] does little more than restate the terms of the [FACT Act] itself," <u>Gonzales</u>, 546 U.S. at 256. Where "[t]he language [at issue] . . . comes from Congress, . . . the near equivalence of the [term in the] statute and regulation belies the [Commission's] argument for . . . deference[,]" because "the question . . . is not the meaning of the regulation but the meaning of the statute." <u>Id.</u> at 257.  "An agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language." <u>Id.</u>

According to the Commission, the statutory definition of "creditor" under the ECO Act, which is incorporated into the FACT Act, "covers all entities that regularly permit deferred payments for goods or services," and can include "a retailer or service provider that, on a regular basis, allows its customers to make purchases or obtain services and then bills them for payment at the end of each month . . . ."  Extended Enforcement Policy at 1 n.3.  While, as both parties concede, attorneys may derive payment from their clients through all sorts of arrangements (e.g. retainer agreements, contingency agreements, or invoiced billing), Pl.'s Mem. at 21; Def.'s Opp'n at 21, it is the Commission's position that only one of these billing practices brings an attorney within the purview of the Red Flags Rule – billing by monthly invoice – because it amounts to an extension of credit to a client for the time between when the service is provided and when payment for the service is made.  Def.'s Opp'n at 10, 21 (referencing The Extended Enforcement Policy at 1 n.3).  Specifically, the Commission states that "creditors under the ECO[ Act] include professionals, such as lawyers . . . who bill their clients after services are rendered. . . . or . . . that, on a regular basis, allow[] its customers to . . . obtain services and then bills them for payment at the end of each month."  The Extended Enforcement Policy at 1 n.3.

This interpretation of the ECO Act's definitions of credit and creditor is too broad. The primary problem lies in the Commission's interpretation of what it means to defer payment.  "Defer," in it ordinary meaning, means to postpone or delay.  See Webster's Third New Int'l Dictionary 591 (1981); see also Black's Law Dictionary 486 (9th ed. 2009).  To invoice client at the end of each month is not delaying payment or giving a client a right to postpone payment.  As a practical matter in the legal context, legal

services are not the type of services that can in may instances be billed and payment received simultaneously with the occurrence of the services, as can be done, for example, when one's furnace is repaired or catering services are provided for a wedding.  Therefore the Commission's distinction between contingency payments, retainer fees, and invoiced billing makes little sense.  As the plaintiff points out, in the context of the legal profession "there [really] is no functional difference between fees paid by retainer, contingency arrangements and invoice."  Pl.'s Mem. at 23.  Because of ethical constraints, attorneys cannot exercise ownership interests over funds received from a client before their services are actually rendered or expenses are incurred even if funds are provided to attorneys in advance of the services being rendered or the expenses being incurred.  In such situations, the funds must be maintained in a separate client trust account.  See Model Rules of Prof'l Conduct R. 1.15(c) (2009) ("A lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred."); see also Id. at R. 1.19 (2009) (indicating that a lawyer must "refund[] any advance payment of fee or expense that has not been earned or incurred" at the termination of the representation).  And as a practical matter, it would be unreasonable to expect attorneys to bill for services in any manner other than periodically, especially given the frequent unanticipated services attorneys have to perform for their clients or the practical reality that clients may lack the ability to immediately access funds when legal services unexpectedly have to be performed without delay.  Not only would immediate billing and collection of fees and expenses be impractical, considering the unique nature of the practice of law, but contrary to the Commission's position, conducting a legal practice in that manner would be extremely

costly and time consuming.  It does not take much imagination to appreciate the added

cost and burden attorneys would incur if they were required to immediately calculate, bill

and collect their fees after each task is performed or else run afoul of the Commission's

construction of the FACT Act through its adoption of the Red Flags Rule.

     This point brings the Court to the second problem with the Commission's

interpretation: it does not take into consideration how legal services must be tabulated

and billed.  In essence, the Commission's view classifies each task attorneys complete as

a distinct service, which fails to take into account the nature of the relationship that exists

between attorneys and their clients.  Usually, they are relationships that exist over an

extended period of time, during which services may be provided on a continuous basis

that can last for days, weeks and even months or longer.  This is particularly true when a

case is in litigation.  Accordingly, an end-of-the-month bill will frequently not reflect the

completion of the services provided to a client, but rather an interim submission for

payment due at that time based on services provided throughout the billing period.

     Another problem then with the Commission's interpretation in its Extended

Enforcement Policy is that its monthly billing cycle policy for determining who is a

creditor seems completely arbitrary.  With the absence of any fact-finding conducted

during the rulemaking process, the Court cannot assess why the Commission selected this

time frame over another.  And considering that the monthly time period seems to have

been plucked out of thin air, what would stop the Commission from arbitrarily

concluding in the future that another period of time, like bi-monthly or weekly, should be

employed?  In fact, the Commission's attorney represented at the hearing on the plaintiff's

motion for partial summary judgment that any bill not submitted to a client immediately

upon rendering a service and not paid virtually simultaneously upon its submission creates a debtor-creditor relationship. This position is extreme and clearly could not have been a result anticipated by Congress given the obvious intrusion the Commission's approach would have into the relationships between attorneys and their clients.

The Commission's interpretation is also not dispositive of the issue because it represents an interpretation that evolved after the period for notice and comment closed, and without any fact-finding justification for the decision. Tripoli Rocketry Ass'n, 437 F.3d at 83 ("But where an agency has articulated no reasoned basis for its decision – where its action is founded on unsupported assertions or unstated inferences – we will not abdicate the judicial duty carefully to review the record to ascertain that the agency has made a reasoned decision based on reasonable extrapolations from some reliable evidence." (citation and internal quotation omitted)). To be clear, the Court is not saying that an agency with congressional authority cannot develop, apply, or adapt any reasonable interpretation it deems appropriate. See Rust v. Sullivan, 500 U.S. 173, 186 (1991) (finding that an agency's revised interpretation may still receive deference because "[a]n agency is not required to establish rules of conduct [that once established must] last forever" (citations and internal quotations omitted)); see also Skidmore, 323 U.S. at 140 (indicating that whether an agency's interpretation of a regulation is "consisten[t] with earlier and later pronouncements" may factor into whether an agency's interpretation has the "power to persuade"). Rather, it is the Court's conclusion that the Commission's interpretation is not persuasive because it does not correspond with any agency factual findings supporting the need to redress identity theft associated with the legal profession and why existing regulations of the profession are inadequate, assuming a problem even

exists.  See Tripoli Rocketry Ass'n, 437 F.3d at 81 ("The fatal shortcoming of [the

agency's] position is that it never reveals how it determines that [the standard it

employed] . . . . reflects reasoned decisionmaking.").  From the record before the Court

(or more accurately the lack of a record), the best that can be gleaned is that identity theft

in the attorney-client context is only a theoretical problem, especially given the role of

state professional codes of conduct and other ethical codes to which attorneys must

abide,[12] and the Court cannot conclude that it is an actual problem given the absolute lack

of any legislative, regulatory or other evidentiary findings that have been brought to the

Court's attention.  Id. at 83 ("It is well understood in administrative law that the 'focal

point for judicial review should be the administrative record already in existence, not

some new record completed initially in the reviewing court.'" (citation omitted)).

---

[12]        The Commission maintains that there are no existing rules of professional or ethical conduct that directly address identity theft and therefore its regulation fills a regulatory void to protect the interests of third-party victims, interests that would otherwise go without protection absent the application of the Red Flags Rule to attorneys.  Def.'s Opp'n at 32.  For several reasons, the Court rejects this position.  First, this position is flawed by the Commission's supposition that attorneys can bill their clients so as not to be brought within the purview of the Rule.  Id. at 11-12, 21.  However, putting that fact aside, the Commission's position, while literally valid, does not persuade the Court that the plethora of rules already in existence do not sufficiently protect the concerns identified by the Commission.  In fact, the same rules that protect clients by holding attorneys to mandatory ethical and professional standards appear to both directly and indirectly protect potential third-party victims from any potential for identity theft.  For example, pursuant to the plaintiff's Model Rules of Professional Conduct, attorneys are obligated to "provide competent representation," meaning that they must possess "the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."  Model Rules of Prof'l Conduct R. 1.1.  Based on a plain reading of this rule, attorneys would be acting in defiance of this rule if they blindly proceeded to represent a client without  knowing exactly who they are representing.  The Rules also obligate attorneys to respect the interests of third-parties, including theoretically, potential victims of identity theft.  Specifically, "[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person."  Id. at R. 4.4(a).  Further, lawyers are obligated to never "make a false or misleading communication about . . . the lawyer's services," i.e. a communication that "contains a material misrepresentation of fact or law."  Id. at R. 7.1; see also id. at R. 3.3 (addressing candor attorneys owe to tribunals).  The Court assumes that it would be nothing other than a material misrepresentation for a lawyer misrepresented the identity of a client.  And finally, attorneys are obligated not to use the attorney-client relationship to perpetrate a fraud or to advance any other illegal activity and must "disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client."  Id. at R. 4.1(b).  These rules make it patently clear that attorneys are already obligated to conduct themselves in a manner that promotes the objectives of the Red Flags Rule, and the Commission's position that its regulation is needed to protect third-parties against identity theft is just not the case.

There is another procedural problem as well: at no time in the rulemaking process did the Commission provide any indication that the definition of creditor was to include attorneys who invoice their clients, so its post-rulemaking interpretation first disclosed on April 30, 2009 (almost a year and a half after the final Rule was issued) came out-of-the-blue.  The Commission's final Rule issued in November 2007, indicated that creditors covered by the Rule "include[d] lenders such as banks, finance companies, automobile dealers, mortgage brokers, utility companies, and telecommunications companies," 16 C.F.R. § 681.1(b)(5), and the Commission reiterated nearly a year later that the definition of creditors included entities such as "finance companies, automobile dealers, mortgage brokers, utility companies, telecommunications companies, and non-profit and government entities that defer payment for goods or services."  Id.  Never in the rulemaking process did the Commission even mention attorneys who bill their clients through monthly invoices.  While the Commission's examples were just that, examples, and therefore the principle of construction inclusio unius, exclusio alterius (i.e. the listing of some things implies that all things not included in the list were purposefully excluded, Robinson v. Napolitano, 554 F.3d 358, 365 (3d Cir. 2009)) is not dispositive of the issue, Helvering v. Morgan's, Inc., 293 U.S. 121, 126 n.1 (1934), the examples do give some indication as to the entities that the Commission intended the Rule to cover.  None of these entities and entities that they interact with in operating their businesses even marginally resemble the relationship attorneys have with their clients.  The Commission argument that the FACT Act should be applied to attorneys just like other acts of general applicability (i.e. statutes that "cover[] 'any person,'" Def.'s Opp'n at 31), is not compelling given that the FACT Act adopted a specific use of the term credit and

creditor, and unlike universal coverage connoted from the use of the word person, the FACT Act does not inherently bring within its purview attorneys for the reasons already expressed.  Rulemaking conducted in the manner employed in this situation would totally defeat the entire purposes for the notice and comment requirement.

In short, the Commission's Extended Enforcement Policy is not supported by either the plain language of the ECO Act (and therefore also not the plain language of the FACT Act) or the applicable case law.  Nor was the Extended Enforcement Policy the product of notice-and-comment rulemaking, but rather it appears that the decision was made without any degree of deliberation or comment from the public, nor is it supported by anything other than post hoc rationalizations.  That no record has been developed even showing that identity theft is a problem in the attorney-client context is telling and defeats the Commission's position to the contrary.

An additional concern of the Court is that state-level authorities have throughout the history of our nation regulated the conduct of attorneys, not the federal government. Am. Bar Ass'n, 430 F.3d at 472.  The Commission is correct in noting that Congress may regulate some state matters directly, Def.'s Opp'n at 33, but it is also true that Congress does not tend to interject itself into an arena where it hasn't generally ventured without explicit explanation hoping that the states will not notice the usurpation of their authority, Am. Bar Ass'n, 430 F.3d at 472.  As recently pronounced by the Circuit in a case involving another attempt by the federal government to regulate the conduct of attorneys:

> The states have regulated the practice of law throughout the history of the country; the federal government has not. This is not to conclude that the federal government could not do so. We simply conclude that it is not reasonable for an agency to decide that Congress has chosen such a course of

> action in language that is, even charitably viewed, at most
> ambiguous.

Id. (emphasis added).  As the Commission notes, this "plain statement rule is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." Def.'s Opp'n 25 (citing Gregory v. Ashcroft, 501 U.S. 452, 461 (1991)).  The observation underlies the delicate balance that exists between the two sovereigns, and like the Circuit, the Court will not infer that Congress transgressed into a traditional area of state regulation predicated on nothing more than silence and conjecture.

One final difficulty the Court has in accepting the Commission's position is that application of the Red Flags Rule creates another barrier for attorneys to build the level of trust necessary for clients to feel that they can openly communicate with their attorneys.  And without the free flow of information between an attorney and his or her client, surely the quality of representation an attorney can provide will be adversely impacted.  This is particularly true in criminal cases, as anyone who has ever represented criminal defendants appreciates.  Many such defendants do not believe at the onset that their attorneys have their best interest at heart.  And questions by attorneys at the onset of the relationship designed to confirm that the client (or potential client) is who he or she purports to be will likely be construed by the client as a challenge to his or her integrity and undercut the ability to develop a relationship of trust.  For the reasons already set forth above, attorneys are already obligated, at least implicitly, by the rules of professional conduct to know who they are representing, so forcing attorneys to test their clients' assertions of who they are is an intrusion into the attorney-client relationship that is not only unnecessary, but also unwise.  Regulation of the complexities of the

relationship are best left to the well-developed ethical and professional codes of conduct and the expertise of associated state disciplinary tribunals tasked with the obligation of enforcing them, not the Commission.

It follows then that the Commission's interpretation of its own regulation, the Red Flags Rule, as set forth in the Extended Enforcement Policy is both plainly erroneous and inconsistent with the purpose underlying the enactment of the FACT Act. The Commission not only seeks to extend its regulatory power beyond that authorized by Congress, but it also untimely and arbitrarily selects monthly invoice billing as the activity it seeks to regulate. Moreover, for all the reasons set forth in this Memorandum Opinion, the Commission's position lacks the "power to persuade," Skidmore, 323 U.S. at 140, and is undeserving of deference. Accordingly, the Court finds that the Commission's actions violate the APA and must be rejected because the Red Flags Rule cannot be properly applied to attorneys in the overly broad manner in which the Commission seeks to enforce it.[13]

_____/s/_____
REGGIE B. WALTON
United States District Judge

---

[13]     An Amended Order consistent with the Court's ruling accompanies this Memorandum Opinion.